**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| DOMINIQUE ALEXANDER, CARVELL BOWENS, CYRUS CEZAR, DAMON CRENSHAW, DAJAI FIELDS, CYNTHIA FLORES, TRACY FOSTER, JASMIN GALVAN, DEBBIE KIM, ALEXIS MCKINNEY, LAPREA PIERCE, AMY SMITH, LAKEISHA SMITH, NATHAN TINDALL, ELISEO VALDEZ, COURTNEY WADLOW, CNAYA WARREN, JANE AND JOHN DOE BRIDGE PLAINTIFFS 1-10 | § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:22-cv-1193 |
| Plaintiffs, | § § | |
| vs. | § § | |
| CITY OF DALLAS, TEXAS; EDGARDO GARCIA; ULYSHA RENEE HALL; JOHN AND JANE ROE DALLAS POLICE OFFICERS 1-10; DALLAS COUNTY, TEXAS; MARIAN BROWN; JOHN AND JANE SMITH SHERIFF'S DEPUTIES 1-10; STATE OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW; JOHN AND JANE WHITE, STATE TROOPERS 1-10, FEDERAL BUREAU OF INVESTIGATION, DEPARTMENT OF HOMELAND SECURITY, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES NATIONAL GUARD; JOHN AND JANE BLACK FEDERAL AGENTS 1-10 | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

COME NOW, Dominique Alexander, Carvell Bowens, Cyrus Cezar, Damon Crenshaw,

Dajai Fields, Cynthia Flores, Tracy Foster, Jasmin Galvan, Debbie Kim, Alexis Mckinney, Laprea Pierce, Amy Smith, Lakeisha Smith, Nathan Tindall, Eliseo Valdez, Courtney Wadlow, Cnaya Warren, and Jane and John Doe Bridge Plaintiffs 1-10 (collectively, "Plaintiffs") and bring this civil action against: The City of Dallas, Texas; City of Dallas Police Chief Edgardo "Eddie" Garcia ("Chief Garcia") in his individual and official capacities; City of Dallas Former Police Chief Ulysha Reneé Hall ("Chief Hall") in her individual and official capacities; and City of Dallas John and Jane Roe Police Officers 1–10 in their individual and official capacities (the "DPD Officer Defendants," and together with the City of Dallas, Chief Garcia, and Chief Hall, the "City of Dallas Defendants"); Dallas County, Texas; Dallas County Sheriff Marian Brown ("Sheriff Brown"), in her individual and official capacities; Dallas County John and Jane Smith Sheriff's Deputies 1-10 in their individual and official capacities (the "Sheriff Deputy Defendants," and together with Dallas County, Sheriff Brown, the "Dallas County Defendants"); and The State of Texas; the Texas Department of Public Safety ("DPS"); DPS Director Steven C. McCraw in his individual and official capacities; and John and Jane White State Troopers 1-10 in their individual and official capacities (the "State Trooper Defendants," and together with the State of Texas, DPS, and DPS Director Steven C. McCraw, the "State of Texas Defendants"), the Federal Bureau of Investigation, Department Of Homeland Security, Bureau of Alcohol, Tobacco, Firearms, and Explosives, United States National Guard; John and Jane Black Federal Agents 1-10 in their individual and official capacities ("Federal Defendants") and for cause would show the Court the following:

## I.    INTRODUCTION

1.      In the wake of the brutal and unjustified May 25, 2020 killing of George Floyd by police officers in Minneapolis, Minnesota, hundreds of thousands of Americans took to

public streets and forums to protest police brutality and racial inequality. Dallas was no exception, with peaceful protests occurring across the city, beginning on May 29, 2020, and continuing throughout the remainder of 2020 (the "2020 Protests"). Undeterred by the fact that police officers' use of excessive force was the very subject of the demonstrations and protests, City of Dallas Police Department ("DPD") officers repeatedly used extreme and unconstitutional methods, and lethal force against these crowds, targeting peaceful, non-threatening protesters and bystanders with tear gas, smoke bombs, flash-bangs, pepper balls, mace, and what are known as "kinetic impact projectiles," or "KIPs." Upon information and belief, deputies from the Dallas County Sheriff's Department ("Sheriff's Department") and troopers from the Texas Department of Public Safety ("DPS") also engaged in similar conduct against protesters and bystanders in coordination with and/or at the direction of the City of Dallas Defendants. Officers also unlawfully detained, seized, tear-gassed and smoke-bombed protesters simply because they exercised their First Amendment rights.

2.      Dominique Alexander, Carvell Bowens, Cyrus Cezar, Damon Crenshaw,  Dajai Fields, Cynthia Flores, Tracy Foster, Jasmin Galvan, Debbie Kim, Alexis Mckinney, Laprea Pierce, Amy Smith, Lakeisha Smith, Nathan Tindall, Eliseo Valdez, Courtney Wadlow, Cnaya Warren, and Jane and John Doe Bridge Plaintiffs 1-10 (collectively "Plaintiffs) peaceably attempted to exercise their First Amendment rights by participating in the 2020 Protests in Dallas, Texas on June 1, 2020.  However, on that day, Plaintiffs became victims of the very same unjustified police brutality which the ongoing 2020 Protests opposed. Specifically, Plaintiffs were unlawfully detained on Margaret Hunt Bridge in violation of their constitutional rights and were harmed when DPD Officer Defendants, Sheriff Deputy Defendants, and/or State Trooper Defendants, and/or Federal Agent Defendants fired tear gas canisters at them, shot

them with rubber bullet KIP's, and seized and restrained them for hours ("Bridge Incident").

3.      This is a civil action for relief for violations of Plaintiffs' civil rights and harm they sustained as a result of the acts and omissions by Defendants. Defendants, both individually and collectively, were responsible for the excessive use of force against Plaintiffs and their resulting physical injuries, and for violating Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. These injuries are the direct result of official policies of the respective city and county law enforcement agencies, the State of Texas, U.S. Federal Agencies, and failures by the same and their current and former leadership to implement and enforce policies and standards that ensure their officers, deputies, and troopers know and are trained in the constitutional limits of force against civilians, particularly those exercising their First Amendment rights.

## II.      PARTIES

4.      Plaintiff Dominique Alexander is an individual resident of the Northern District of Texas and can be served through the undersigned counsel of record.

5.      Plaintiff Carven Bowens is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

6.      Plaintiff Cyrus Cezar is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

7.      Plaintiff Damon Crenshaw is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

8.      Plaintiff Cynthia Flores is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

9.      Plaintiff Tracy Foster is an individual resident in the Northern District of Texas

and can be served through the undersigned counsel of record.

10.     Jasmin Galvan is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

11.     Debbie Kim is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

12.     Alexis Mckinney is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

13.     Laprea Pierce is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

14.     Amy Smith is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

15.     Lakeisha Smith is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

16.     Nathan Tindall is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

17.     Eliseo Valdez is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

18.     Courtney Wadlow is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

19.     Cnaya Warren is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

20.     Jane and John Doe Bridge Plaintiffs 1-10 are individual residents in the Northern District of Texas who were participated in the "Bridge Incident" and can be served through the

undersigned counsel of record.

21.     Defendant the City of Dallas, Texas is a political subdivision of the State of Texas and funds, operates, and controls DPD. The City of Dallas, along with the Dallas City Council, Chief Garcia, and Former Chief Hall, are (or were) responsible for implementing DPD's budget, policies, procedures, practices, and customs, and for the acts and omissions challenged by this suit. DPD under the direction of the Dallas City Council, Chief Garcia, and Former Chief Hall, is also responsible for preventive, investigative, and enforcement services for all citizens of the City of Dallas. Defendant the City of Dallas may be served with process by serving the Dallas City Attorney, Christopher J. Caso, at 1500 Marilla Street, Room 7DN, Dallas, Texas; Phone (214) 670-3519 or Fax: (214) 670-3519.

22.     Defendant Chief Edgardo "Eddie" Garcia is the Chief of Police of DPD and a final policymaker for DPD, with the authority for setting policies, including training of DPD Officers. Chief Garcia may be served with process by serving the Dallas City Attorney, Christopher J. Caso, at 1500 Marilla Street, Room 7DN, Dallas, Texas; Phone (214) 670-3519 or Fax: (214) 670-3519.

23.     Between 2017 and 2020, Defendant Former Chief Ulysha "Renee" Hall was the Chief of Police of DPD and a final policymaker for DPD, with the authority for setting policies, including training of DPD Officers. *See Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) (the Fifth Circuit "[has] previously found that Texas police chiefs are final policymakers for their municipalities."). Chief Hall was also the supervisor for the DPD Officer Defendants at all times relevant in this complaint. Upon information and belief, Chief Hall is a resident of Maryland and may be served with process wherever she may be found.

24.     Defendants John and Jane Roe Officers 1-10 are certain individuals whose

identities are presently unknown to Plaintiffs but who, upon information and belief, were at all relevant times DPD Officers and were acting in such capacity. Defendants John and Jane Roe 1-10 are responsible for the acts and omissions challenged by this lawsuit. Plaintiffs will amend this complaint to substitute the true names and capacities of the Defendants John and Jane Roe 1-10 when ascertained during this litigation.

25.     Defendant Dallas County, Texas is a political subdivision of the State of Texas, and funds, operates, and controls the Dallas County Sheriff's Department. Dallas County, along with Sheriff Brown, is responsible for implementing the Sheriff's Department's budget, policies, procedures, practices, and customs, and for the acts and omissions challenged by this suit. The Sheriff's Department, under the direction of Dallas County and Sheriff Brown, is also responsible for preventive, investigative, and enforcement services for all citizens of Dallas County. Dallas County may be served with process the Dallas County Sheriff's Department at 133 N. Riverfront Blvd., LB-31, Dallas, TX 75207.

26.     Defendant Sheriff Brown is the Dallas County Sheriff and a final policymaker for the Sheriff's Department, with the authority for setting policies, including training of the Sheriff's Deputies. *See Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) ("[i]t has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement,[]." (quoting *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990), *reh'g denied*, 967 F.2d 181 (5th Cir. 1992))). Sheriff Brown may be served with process by serving County Judge Clay Jenkins, 411 Elm Street, # 200, Dallas, Texas 75202; Phone (214) 653-7949.

27.     Defendants John and Jane Smith 1-10 are certain individuals whose identities are presently unknown to Plaintiffs but who, upon information and belief, were at all relevant times Sheriff's Deputies and were acting in such capacity. Defendants John and Jane Smith 1-

10 are responsible for the acts and omissions challenged by this lawsuit. Plaintiffs will amend this complaint to substitute the true names and capacities of the Defendants John and Jane Smith 1-10 when ascertained during this litigation.

28.     Defendant the State of Texas can be served at the Office of the Attorney General, 300 West 15th Street, Austin, Texas 78701; or by mail to: P.O. Box 12548, Austin, Texas 78711.

29.     Defendant Texas Department of Public Safety ("DPS") is a state agency organized under the laws of the State of Texas. DPS is responsible for promulgating and implementing policies and procedures that govern the conduct of State Troopers, and to train and supervise State Troopers in the implementation of those policies. It may be served through its Director, Steven C. McCraw, at 5805 North Lamar Boulevard, PO Box 4087, Austin, Texas.

30.     Defendant Steven C. McCraw is the Director of DPS and oversees the operations and functions of DPS, including but not limited to, DPS's budget, policies, procedures, practices, and customs, as well as the acts  and omissions challenged by this suit.  Director McCraw is  sued in his official capacity and may be served at 5805 North Lamar Boulevard, PO Box 4087, Austin, Texas.

31.     Defendants John and Jane White State Troopers 1-10 are certain individuals whose identities are presently unknown to Plaintiffs but who, upon information and belief, were at all relevant times State Troopers and were acting in such capacity. Defendants John and Jane White State Troopers 1-10 are responsible for the acts and omissions challenged by this lawsuit. Plaintiffs will amend this complaint to substitute the true names and capacities of the Defendants John and Jane White State Troopers 1- 10 when ascertained during this litigation.

32.     Defendant Federal Bureau of Investigation ("FBI") is the principal federal law

enforcement of the United States and may be served wherever it may be found

33.    Department of Homeland Security ("DHS")is a federal agency charged improving the security of the United States and may be served wherever it may be found.

34.    Defendant Bureau of Alcohol, Tobacco, Firearms, And Explosives ("ATF") is an agency of the United States and may be served wherever it may be found.

35.    Defendant United States National Guard is an agency of the United States and may be served wherever it may be found.

36.    Defendants John and Jane Black Federal Agents 1-10 are certain individuals whose identities are presently unknown to Plaintiffs but who, upon information and belief, were at all relevant times federal employees and were acting in such capacity. Defendants John and Jane Black Federal Agents 1-10 are responsible for the acts and omissions challenged by this lawsuit. Plaintiffs will amend this complaint to substitute the true names and capacities of the Defendants John and Jane Black Federal Agents 1-10 when ascertained during this litigation.

### III.    JURISDICTION

37.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

38.    Federal jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

39.    The Court has general personal jurisdiction over the City of Dallas Defendants and the Dallas County Defendants by virtue of their citizenship and residence in Dallas County, Texas, as well as their continuous and systematic contacts with the State of Texas. Defendant the City of Dallas is a municipality incorporated in the State of Texas. Defendant Dallas County is a county in the State of Texas. Upon information and belief, the DPD Officer Defendants and Sheriff's Deputy Defendants are residents of the State of Texas.

**ORIGINAL COMPLANT**                                                        Page **9** of 98

40.     The Court has general personal jurisdiction over the State of Texas Defendants by virtue of their citizenship and residence in the State of Texas, as well as their continuous and systematic contacts with the State of Texas.

41.     Furthermore, the Court has specific personal jurisdiction over the City of Dallas Defendants, the Dallas County Defendants, the State of Texas Defendants, and Chief Hall because Plaintiffs' claims against them arise out of or relate to a contact between them and the State of Texas. The DPD Officer Defendants, Sheriff Deputy Defendants, and the State Trooper Defendants used excessive force against Plaintiffs during protests in Dallas, Texas, acting on orders and policies promulgated by Chief Hall and City of Dallas policymakers. Plaintiffs' claims against the City of Dallas Defendants, the Dallas County Defendants, the State of Texas Defendants and Chief Hall arise from that occurrence and Defendants' contact in the state of Texas.

## IV.     VENUE

42.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

43.     Venue in the Northern District of Texas-Dallas Division  is proper pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1367 as the incidents that give rise to this Complaint occurred in Dallas, Texas, within the Northern District of Texas.

## V.     CONDITIONS PRECEDENT

44.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

45.     All conditions precedent have occurred or have  been  performed. *See* Fed.  R. Civ. P. 9(c).

## VI.    STATEMENT OF FACTS

**1.    The 2020 Protests in Dallas, Texas.**

27.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

28.    On Monday, May 25, 2020, an unarmed Black man named George Floyd was murdered by an officer of the Minneapolis Police Department. The events of Mr. Floyd's arrest and murder were captured on video by multiple bystanders as well as individual officers' body cameras. Peaceful protests and demonstrations soon followed through the United States, including in Dallas, Texas.

29.    Undeterred by the fact that excessive police force was the very subject of these nationwide demonstrations, videos, photos, and reports of police brutality on massive scales at these protests arose in the weeks immediately following Mr. Floyd's death. Here in Dallas, DPD Officers, Sheriff's Deputies, and State Troopers repeatedly used extreme and lethal force against these crowds during the 2020 Protests, targeting peaceful, non-threatening protesters with tear gas, smoke bombs, flash-bangs, pepper balls, mace, and ammunition that are known as "kinetic impact projectiles," or "KIPs."

30.    KIPs, which include so-called "rubber bullets" or "sponge bullets," are often used by American police forces to control crowds. The manufacturers, distributors, and sellers of these projectiles—and the police departments that use them against their own citizens— praise these bullets as being "nonlethal" or "less lethal." They are not. In fact, the fatality, morbidity, and significant risks of injuries from KIPs have been well documented, and KIPs kill approximately three percent of all people they strike. Regardless, in cities across the

country, including Dallas, police departments attempted to quell participation in the 2020 Protests by firing KIPs into crowds, even though five decades of evidence shows such weapons can disable, disfigure, and even kill.

31.     In addition to pepper balls, KIPs, and tear gas, law enforcement agencies around the country, including DPD, have used an increasingly violent technique referred to as "kettling," wherein police officers block off streets and push or "corral" a group of protesters into a small area, like a bridge or city block, to restrict their movement. Thereafter, the police officers move in on the protesters to detain the individuals, arrest the individuals, or allow them to leave through an exit controlled by police.[6] In several instances, officers have held the protesters for hours without food, water or access to restrooms, and unnecessarily used tear gas, smoke bombs, rubber bullets, or other tactics against the kettled individuals in an attempt to "control" or "subdue" the crowd.

32.     Also, known as "trap and detain," this highly controversial technique routinely results in increased tensions between police and protesters who have been trapped in a small area. Originally developed as a military tactic, kettling was initially deployed by military forces in combat to subdue their opponent on the battlefield. Today, however, police departments use this same tactic against protesters, who in many cases are peacefully exercising their constitutional rights.

33.     Moreover, kettling results in the violation of the constitutional rights of peaceful protesters and other innocent bystanders, who are often swept up by police in their attempt to "control" the crowd. Rather than identify and single out the few bad actors, if any, officers engaged in kettling indiscriminately target individuals in a general vicinity and subject them to

the same antagonistic and even violent treatment, regardless of their individual conduct or participation in the protest. Kettling therefore infringes on individuals' First Amendment, Fourth Amendment, and Fourteenth Amendment rights, as protesters and other bystanders are wrongfully detained, arrested, and/or subjected to unreasonable searches, seizures, and excessive force while exercising their constitutional rights.

34. In the immediate days after Mr. Floyd's death, federal courts in several cities, including Portland, Denver, and Oakland began issuing injunctive relief to prohibit law enforcement agencies from using so-called "less lethal" crowd control tactics on peaceful protesters, such as rubber bullets and tear gas.

35. The first Dallas protest in the aftermath of Mr. Floyd's death was on May 29, 2020. On that day, and for hundreds of days after, peaceful protestors gathered in downtown Dallas to demonstrate against police brutality and racial inequality. Although a small minority of individuals present at the scene of the first weekend of protests engaged in destructive activity, including property destruction, those individuals' behavior was profoundly overshadowed by the thousands of otherwise non-violent, non-threatening demonstrators who peaceably exercised their First Amendment rights.

36. Nonetheless, during the 2020 Protests, DPD and other law enforcement departments working with them and/or at DPD's direction (and invited by DPD and Former Chief Hall) directed extreme riot control tactics towards entire groups of protesters posing no harm to officers or anyone else. Dressed in riot gear and driving armored vehicles, DPD and those working with them kettled protestors, deployed riot control devices against ordinary citizens and journalists alike, without regard to whether the circumstances justified it, and shot "less lethal" weaponry at peaceful citizens.

37. During the first seven days of demonstrations in Dallas, DPD Officers and those

working with them, including but not limited to the Sheriff's Deputies and State Troopers, and Federal Agents repeatedly used extreme and lethal force against crowds, directly targeting peaceful, non- threatening protestors with KIPs, tear gas, smoke bombs, and other riot control devices that the City of Dallas and Chief Hall praise as "less lethal." In particular, DPD and those working with them and/or at their direction used pepper balls and a type of KIP called 40mm eXact iMpact extended range "sponge" bullets—often referred to as "rubber bullets"— against protestors, bystanders, and journalists in order to suppress their First Amendment rights, without regard to constitutional limits.

38.     Chief Hall defended her decision and orders to shoot protesters with tear gas— a chemical weapon banned in war—during the 2020 Protests in Dallas.  Hundreds of reports of peaceful protesters, journalists covering protests, and bystanders bleeding and suffering from unwarranted levels of force employed by law enforcement threaten to chill participation in ongoing demonstrations in Dallas.

39.     When DPD Officers and those working with them could not keep protestors moving in the direction they wanted, they called for additional officers with KIPs or tear gas in order to kettle protestors or alter their direction of travel. DPD Officers and those working with them regularly called for the use of tear gas to control the direction in which protestors were traveling. DPD Officers and those working with them often reported they could not kettle protestors exercising their First Amendment rights without the use of gas. DPD Officers and those working with them specifically used tear gas for the specific purpose of kettling crowds that were not apparently posing any direct or imminent threat.

40.     DPD Officers and those working with them were instructed to rush into crowds that were simply moving down the street in order to prevent them from continuing their protests.

DPD Officers specifically reported that pepper ball rounds worked "very well" to disburse protestors who were "agitated" but not apparently posing any threat.

41.     Upon information and belief, during the course of the 2020 Protests and specifically during the May 30, and June 1, 2020 protests in which Plaintiffs participated, Sheriff Deputy Defendants fired tear gas into crowds of protestors exercising their First Amendment rights when they did not pose a direct threat to any officers or property.

42.     Based on the DPD's After Action Report on the George Floyd Protest, several other law enforcement agencies played an active role in the events taking place on May 30, 2020 to June 1, 2020. On information and belief, Sheriff Deputy Defendants and State Trooper Defendants (and others) also engaged in the challenged behavior, specifically kettling and shooting Plaintiffs with rubber bullet KIPs without provocation or justification, which violated their constitutional rights and resulted in injuries to one or more of the Plaintiffs.

43.     Plaintiffs and other non-threatening people present at the first weekend of 2020 Protests in Dallas from May 30 to June 1, 2020, suffered and continue to suffer from injuries caused by Defendants.

**The Bridge Incident**

44.     On Monday, June 1, 2020, all Plaintiffs gathered for a peaceful protest in front of Lew Sterrett Justice Center to exercise their First Amendment rights and voice their concerns regarding recent instances of police brutality.

45.     After the rally at Lew Sterrett Plaintiffs began marching. While marching down Riverfront Drive, DPD directed protestors, including Plaintiffs, onto Margaret Hunt Hill Bridge. DPD had stopped traffic to allow Plaintiffs and other protesters to enter the bridge.

46.     Plaintiffs were met at the on the east end of the bridge by a line of officers.

Upon meeting the officers at the east end of the bridge, protestors stopped and peacefully stood while chanting.

47.     Without provocation, officers and/or deputies began to fire smoke canisters and other KIPs towards Plaintiffs and other individuals on the bridge. To avoid being seriously injured, Plaintiffs turned away from the officers and/or deputies firing towards them and tried to leave the bridge from the direction which they had entered.

48.     Upon trying to vacate the bridge the protestors were met with another line of law enforcement officers that blocked their exit from the bridge.

49.     The law enforcement officers had kettled Plaintiffs on the bridge. They began to tell the protestors to get on the ground and advised that they were all being arrested and began to zip tie the protestors who were laying down on their stomachs flat on the ground.

44.     At no point did they pose an immediate threat of serious harm, or threat of any kind, to the officers, troopers, and/or deputies who fired at them.

45.     DPD Officers, Sheriff's Deputies, and State Troopers would eventually detain approximately 674 protesters on the Bridge at the end of the march from the Frank Crowley Courts Building downtown that was, by all accounts, entirely peaceful. Video footage taken by march participants and journalists confirms that the only violence on the Bridge came from DPD Officers, Sheriff's Deputies, and State Troopers who fired so-called "less lethal" rubber bullets, along with pepper balls, smoke bombs, and tear gas, at nonthreatening, kneeling demonstrators who had been kettled by police. Assessing the incident the next day, Chief Hall said, "I strongly believe we made the right decisions to deter and disperse the large crowd on the bridge."

46.     But the DPD Officers Defendants, Sheriff Deputy Defendants, and State Trooper Defendants did *not* "deter" or "disperse" the crowd and instead deliberately ***prevented*** participants from leaving by kettling them onto the Bridge.

47.     When the crowd's march from downtown reached the intersection with the roadway leading to the Bridge, demonstrators found the westbound ramp onto the Bridge was not blocked by police, unlike other sides of the intersection. As the group of protesters they were a part of proceeded onto the Bridge, the Plaintiffs never received an instruction not to go on to the Bridge or warning that they would be arrested or detained for doing so. Protesters and journalists on the scene say they were told by law enforcement to "continue moving" but were never warned not to walk up the ramp to the Bridge.

.

48.     The conduct of DPD Officers, the Sheriff's Deputies, and State Troopers, particularly toward peaceful protestors, shows that Defendants are present at protests not simply to prevent property damage and keep the public safe but rather to retaliate against citizens for exercising their constitutional rights. Indeed, DPD Officers, Sheriff's Deputies, and State Troopers and those working with them were and are dressed and armed to use violence against protestors, demonstrators, and bystanders. It is evident through their militaristic, indiscriminately violent conduct toward peaceful protesters, bystanders, press—and as widely captured on video— that Defendants were not present to serve a public safety role, but instead to dominate the protesters.

49.     Against this backdrop, immediate federal intervention was and continues to be necessary to enjoin the unconstitutional use of excessive force and kettling techniques against peaceful

protests.

**2.     The City of Dallas uses KIPs and other "less lethal" force in a deadly manner—even when it violates the City of Dallas's own written polices and the U.S. Constitution.**

64.     KIPs—often called "rubber," "sponge," or "foam" bullets—describe a category of ammunition used commonly in crowd-control settings, and include pepper balls.[31] Some KIPs are made of hardened foam or plastic, often containing a rigid or metal core. Others are "beanbag" type rounds, and others may be composed of rubber or wood.



The image shows decorative wingdings/symbol font text that is not readable as actual text content. This is encrypted/symbol font that cannot be meaningfully transcribed.

The page content is in dingbat/wingdings font and unreadable.

86.

87.

⊙⊙ⅭⅢⅬⅢⅮ ⅯⅢⅠⅢⅢⅡⅢⅯ ⅭⅢⅢ ⅢⅭⅢⅯⅯⅢⅪ ⅬⅢⅢ ⅧⅠⅢⅯⅢⅢⅢⅪⅯ ⅭⅢⅯⅥⅠⅠ ⅪⅥⅢ ⅭⅢⅭⅢ ⅢⅢⅢⅬ ⅦⅥⅢⅢⅢⅢ ⅢⅪⅢⅠⅢⅢⅥⅢ ⅠⅥⅢⅪⅥⅢ ⅢⅢⅭⅦⅥⅢⅯⅢ ×Ⅲ ⅠⅠⅬⅢ Ⅲ ⅮⅢⅢⅢⅢ ●ⅠⅥⅥⅢⅢⅠ Ⅲ ⅦⅥⅢⅢⅢⅢ ⅢⅢⅥⅠⅢⅢ ⅫⅯⅭⅢⅢⅢⅢ ⅠⅥⅢ ⅠⅥⅢ ⅢⅣ ⅠⅥⅢⅥⅢ ⅢⅢⅭⅦⅥⅢⅯ ⅣⅥⅥ ⅢⅥⅥⅢⅢ ⅢⅥⅬⅥⅥⅢⅢ ⅦⅠⅦⅦⅥⅢⅢⅯ ⅭⅣⅥⅢ Ⅸ ⅭⅢ ⅢⅢⅢⅢ ⅢⅣⅢⅢⅢ ⅢⅥⅢⅢⅢ ⅣⅭⅢⅢ Ⅲ ⅢⅣⅥⅥⅠⅢⅪ ⅠⅢⅢⅥⅭⅪ ⅥⅢⅥ ⅭⅢⅬⅢ ⅭⅢ ⅦⅥⅢⅥⅭⅬⅭⅢⅬ ⅢⅡⅣⅭⅢ ⅢⅢⅥⅢ ⅢⅥⅥⅥⅥⅢⅢⅭⅢⅢⅢ ⅥⅠⅥⅥⅥⅢⅢ Ⅺ ⅢⅢ ⅦⅥⅥ Ⅲ

    88.  ⅧⅠⅢⅢⅠⅥ ⅠⅥⅠⅥⅥ ⅢⅥⅢⅢⅥⅭⅢⅬ ⅦⅥⅢⅥⅠⅥⅥⅢⅢ ⅢⅥⅥⅢ Ⅳ ⅠⅭⅢⅢ ⅭⅥⅥⅢⅥⅠⅥⅢⅢⅬ ⅢⅥ ⅧⅥⅠⅥⅥⅢⅭⅢⅪ ⅠⅠⅥⅢ ⅢⅣ ⅢⅢⅢⅢ Ⅲ ⅠⅥⅭⅢ ⅠⅥⅢ ⅫⅥⅢⅢ ⅢⅥⅥⅥⅥⅥⅢⅢⅭ Ⅰ ⅥⅢⅢ ⅢⅥⅢ ⅢⅥⅥⅢⅢⅥⅥⅢⅢⅬ ⅢⅢⅢⅢⅢⅢⅢ ⅢⅣ ⅢⅥⅢ ⅢⅢⅦⅭⅥⅠ ⅢⅢⅬⅢ ● ⅢⅥⅠⅥ ⅥⅢⅢⅥⅯ ⅭⅢⅢ ⅢⅥⅢⅥⅢⅢⅥⅪⅢⅠⅥⅢ ⅢⅢⅠⅥⅢ Ⅰ ⅢⅠⅥⅢⅢ ⅢⅥ ⅭⅢⅠⅥⅢⅢⅢ ⅠⅢ ⅢⅠⅥⅢⅢ ⅭⅥⅥⅠⅠⅥⅢⅬ ⅢⅢⅢⅢ ⅬⅥⅢ ⅢⅠⅥⅬ ⅣⅥⅥⅢⅢ ⅠⅢ ⅢⅢⅠⅥⅢⅬ

89.

91.

92.

96.

97.

[illegible]

106. [illegible]

107. [illegible]

108. [illegible]

109.

110.

111.

112.

113.

118.

119.

120.

121.

122.

123.

124.

127.

- 74 -

139.

140.

141.

142.

143. ✓⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛.

144. ☒⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛ ⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛ ☒⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.

145. ☒⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛ ✓⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ☒⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛

☒⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛

152.

153.

154.

156. ⬤❷⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤❶⬤⬤⬤ ⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤

⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤ ⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤

⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤

⬤⬤⬤ ⬤⬤⬤ ❶⬤⬤ ⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤

⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤ ❷⬤⬤⬤⬤⬤⬤⬤ ⬤

⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤

⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤

⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤

⬤⬤⬤⬤⬤ ⬤⬤⬤❸ ⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤❷⬤ ⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤

⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤⬤ ⬤⬤⬤❷⬤⬤⬤ ❶⬤⬤⬤⬤

⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤❶⬤⬤⬤ ⬤❺ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤

⬤⬤⬤⬤ ⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤

⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤❷⬤⬤ ⬤⬤

❶⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤ ❷⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤

⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤

⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤

⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤❷⬤⬤ ⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤

⬤⬤⬤❶⬤⬤⬤⬤⬤⬤⬤ ⬤⬤ ⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤

157. ⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤

⬤⬤❸ ⬤⬤ ❶⬤⬤ ⬤⬤⬤⬤ ⬤⬤❸⬤❶⬤⬤❸•⬤⬤⬤⬤⬤⬤⬤❶⬤⬤⬤❺ ❸⬤

⬤⬤⬤ ⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤❷⬤⬤⬤•⬤⬤❶⬤⬤

⬤⬤⬤⬤⬤❺ ⬤⬤❷⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤❷⬤⬤❶⬤ ⬤⬤ ⬤⬤⬤ ⬤⬤

⬤❺ ⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤

⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤ ⬤⬤⬤ ❶⬤⬤⬤❸⬤❶⬤

❶⬤⬤ ⬤⬤ ⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤❸⬤⬤ ⬤⬤ ⬤⬤⬤ ⬤⬤⬤⬤⬤ ⬤

⬤⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤❸⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤ ⬤⬤⬤⬤⬤⬤⬤ ⬤

158.

159.

160.

[illegible]

161. [illegible]

162. [illegible]

163.

164.

165.

166.

167.

168.

169.

graphs.

170.     As to each of the above causes of action, by the facts set out herein, Defendants, in whole or part, conspired with each other to (a) deprive, either directly or indirectly, Plaintiffs (and other protesters) of the equal protection of the laws, and of equal privileges and immunities under the laws; or (b) hinder others from giving or securing equal protection of law to all persons in violation of 42 USC § 1985(3).

171.     The City of Dallas Defendants, the Dallas County Defendants, and the State of Texas Defendants conspired (1) across separate law enforcement departments and (2) between local police (DPD Officer Defendants), county sheriff's deputies (Sheriff Deputy Defendants), and state police (State Trooper Defendants) to deprive Plaintiffs of the equal protection of the laws or to hinder others from giving or securing equal protection to all persons.

172.     The DPD After Action Report and photographs taken by Plaintiffs show that Sheriff Deputy Defendants and State Trooper Defendants were present at the protests Plaintiffs attended and that they engaged in the same actions that violated Plaintiffs' constitutional rights as the DPD Officer Defendants.

173.     As a direct and proximate result of Defendants' acts in furtherance of their conspiracy while acting under color state law, Plaintiffs were deprived of their Fourth and Fourteenth Amendment rights and suffered injuries and damages.

## VIII.   DAMAGES

174.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

175.     In whole or in part, as a result of some or all of the above actions or omissions of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of these violations. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs

have suffered and will continue to suffer severe pain of mind and body, emotional dress,

physical manifestations

of emotional distress, and humiliation. As a direct and proximate resultof Defendants' acts and omissions, Plaintiffs were prevented and will continue to be prevented from participating as activists and peaceful protesters with regard to causes that directly impacttheir lives and the lives of their friends, families, and communities.

176.     As a direct and proximate result of Defendants' actions and omissions, as stated above, Plaintiffs suffered:

    (a)     Physical pain and suffering in the past and future;

    (b)     Mental anguish in the past and future; and,

    (c)     Loss of Enjoyment of life in the past and future.

## IX.     STATUTORY DAMAGES

177.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

178.     Plaintiffs are entitled to compensatory damages and punitive damages pursuantto 42 USC § 1988.

179.     As a direct and proximate result of Defendants' acts and omissions in the foregoing respects, Plaintiffs have been required to retain the services of legal counsel and to incur attorneys' fees and costs thereby.

180.     Plaintiffs bring this lawsuit pursuant to 42 U.S.C. § 1983. Plaintiffs are entitled to an award of reasonable attorneys' fees. *See* 42 U.S.C. 1988.

## X.     PUNITIVE/EXEMPLARY DAMAGES

181.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

182.     Additionally, and in the alternative, the conduct of DPD Officer Defendants, the

Sheriff Deputy Defendants, and the State Trooper Defendants and those working with them was

done with malice and/or a specific intent by Defendants to cause substantial injury or harm to Plaintiffs. As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.

183.    In the alternative, the DPD Officer Defendants', the Sheriff Deputy Defendants', and the State Trooper Defendants' heedless and reckless disregard of Plaintiffs' rights, safety, and welfare constitutes more than momentary thoughtlessness, inadvertence, or misjudgment. Instead, the DPD Officer Defendants, the Sheriff Deputy Defendants, and the State Trooper Defendants acted with reckless or callous indifference to the federally protected rights, safety, or welfare of others. Defendants had actual, subjective awareness of the risks of injury or illegality involved, but nevertheless proceeded with conscious, reckless, or callous indifference to the rights, safety, or welfare of others, including Plaintiffs. Such unconscionable conduct goes beyond ordinary negligence, and as such Plaintiffs request punitive and exemplary damages are awarded against Defendants in a sum which is within thejurisdictional limits of this court.

## XI.    JURY TRIAL DEMANDED

184.    Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues so triable.

## XII.    PRAYER

185.    WHEREFORE, Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts

where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiffs

all applicable damages, including but not limited to compensatory, special, exemplary and/or

punitive damages, in

whatever amount Plaintiffs are entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

(a)    Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to past and future: pain and suffering, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' constitutional rights, loss of social pleasure and enjoyment, and other damages to be proved;

(b)    Statutory compensatory damages and punitive damages pursuant to 42 USC § 1988;

(c)    Statutory attorneys' fees and costs pursuant to 42 USC § 1988;

(d)    Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

(e)    Reasonable attorney fees, pre-judgment and post-judgment interest, and costs; and

(f)    Other declaratory, equitable, and/or permanent injunctive relief, as appears to be reasonable and just.

Respectfully submitted,

*//s/ Kim T. Cole*
KIM T. COLE
Texas State Bar No. 24071024
K. COLE LAW, PLLC
11450 U.S. Hwy. 380
Suite 130-189
Crossroads, Texas 76227
(214) 702-2551 (phone)
(972) 947-3834 (fax)
kcole@kcolelaw.com

***Counsel for Plaintiffs***

- 104