## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

| | | |
|---|---|---|
| DOMINIQUE ALEXANDER, CARVELL BOWENS, CYRUS CEZAR, DAMON CRENSHAW, DAJAI FIELDS, CYNTHIA FLORES, TRACY FOSTER, JASMIN GALVAN, DEBBIE KIM, ALEXIS MCKINNEY, LAPREA PIERCE, AMY SMITH, LAKEISHA SMITH, NATHAN TINDALL, ELISEO VALDEZ, COURTNEY WADLOW, CNAYA WARREN, SARAH SHIRLEY, JOSEPH ADAMS, KRISTA ADAMS, JANE AND JOHN DOE BRIDGE PLAINTIFFS 1-10 | § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:22-cv-1193 |
| Plaintiffs, | § § | |
| vs. | § § | |
| CITY OF DALLAS, TEXAS; JOHN AND JANE ROE DALLAS POLICE OFFICERS 1-10; DALLAS COUNTY, TEXAS; JOHN AND JANE SMITH SHERIFF'S DEPUTIES 1-10; | § § § § § § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW, Dominique Alexander, Carvell Bowens, Cyrus Cezar, Damon Crenshaw, Dajai Fields, Cynthia Flores, Tracy Foster, Jasmin Galvan, Debbie Kim, Alexis Mckinney, Laprea Pierce, Amy Smith, Lakeisha Smith, Nathan Tindall, Eliseo Valdez, Courtney Wadlow, Cnaya Warren, Sarah Shirley, Joseph Adams, Krista Adams and Jane and John Doe Bridge Plaintiffs 1-10 (collectively, "Plaintiffs") and bring this civil action against: The City of Dallas, Texas; City of Dallas Police Chief Edgardo "Eddie" Garcia ("Chief Garcia") in his individual and official capacities; City of Dallas Former Police Chief Ulysha Reneé Hall ("Chief Hall") in her individual

and official capacities; and City of Dallas John and Jane Roe Police Officers 1–10 in their individual and official capacities (the "DPD Officer Defendants," and together with the City of Dallas, Chief Garcia, and Chief Hall, the "City of Dallas Defendants"); Dallas County, Texas; Dallas County Sheriff Marian Brown ("Sheriff Brown"), in her individual and official capacities; Dallas County John and Jane Smith Sheriff's Deputies 1-10 in their individual and official capacities (the "Sheriff Deputy Defendants," and together with Dallas County, Sheriff Brown, the "Dallas County Defendants"); and The State of Texas; the Texas Department of Public Safety ("DPS"); DPS Director Steven McCraw in his individual and official capacities; and John and Jane White State Troopers 1- 10 in their individual and official capacities (the "State Trooper Defendants," and together with the State of Texas, DPS, and DPS Director Steven C. McCraw, the "State of Texas Defendants"), the Federal Bureau of Investigation, Department Of Homeland Security, Bureau of Alcohol, Tobacco, Firearms, and Explosives, United States National Guard; John and Jane Black Federal Agents 1-10 in their individual and official capacities ("Federal Defendants") and for cause would show the Court the following:

## I.   INTRODUCTION

1.       In the wake of the brutal and unjustified May 25, 2020 killing of George Floyd by police officers in Minneapolis, Minnesota, hundreds of thousands of Americans took to public streets and forums to protest police brutality and racial inequality. Dallas was no exception, with peaceful protests occurring across the city, beginning on May 29, 2020, and continuing throughout the remainder 2020 (the "2020 Protests"). Undeterred by the fact that police officers' use of excessive force was the very subject of the demonstrations and protests, City of Dallas Police Department ("DPD") officers repeatedly used extreme and unconstitutional methods, and lethal force against these crowds, targeting peaceful, non-threatening protesters and bystanders with tear gas, smoke bombs, flash-bangs, pepper balls, mace, and what are known as "kinetic impact projectiles," or "KIPs." Upon information and belief, deputies from the

Dallas County Sheriff's Department ("Sheriff's Department") and troopers from the Texas Department of Public Safety ("DPS") also engaged in similar conduct against protesters and bystanders in coordination with and/or at the direction of the City of Dallas Defendants. Officers also unlawfully detained, seized, tear-gassed and smoke-bombed protesters simply because they exercised their First Amendment rights.

2.          Dominique Alexander, Carvell Bowens, Cyrus Cezar, Damon Crenshaw, Dajai Fields, Cynthia Flores, Tracy Foster, Jasmin Galvan, Debbie Kim, Alexis Mckinney, Laprea Pierce, Amy Smith, Lakeisha Smith, Nathan Tindall, Eliseo Valdez, Courtney Wadlow, Cnaya Warren, and Jane and John Doe Bridge Plaintiffs 1-10 (collectively "Plaintiffs) peaceably attempted to exercise their First Amendment rights by participating in the 2020 Protests in Dallas, Texas on June 1, 2020. However, on that day, Plaintiffs became victims of the very same unjustified police brutality which the ongoing 2020 Protests opposed. Specifically, Plaintiffs were unlawfully detained on Margaret Hunt Bridge in violation of their constitutional rights and were harmed when DPD Officer Defendants, Sheriff Deputy Defendants, and/or State Trooper Defendants, and/or Federal Agent Defendants fired tear gas canisters at them, shot them with rubber bullet KIP's, and seized and restrained them for hours ("Bridge Incident").

3.          This is a civil action for relief for violations of Plaintiffs' civil rights and harm they sustained as a result of the acts and omissions by Defendants. Defendants, both individually and collectively, were responsible for the excessive use of force against Plaintiffs and their resulting physical injuries, and for violating Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. These injuries are the direct result of official policies of the respective city and county law enforcement agencies, the State of Texas, U.S. Federal Agencies, and failures by the same and their current and former leadership to implement and enforce policies and standards that ensure their officers, deputies, and troopers know and are trained in the constitutional limits of force against civilians, particularly those exercising their First

Amendment rights.

## II.    PARTIES

**PLAINTIFFS**

4.      Plaintiff Dominique Alexander is an individual resident of the Northern District of Texas and can be served through the undersigned counsel of record.

5.      Plaintiff Carven Bowens is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

6.      Plaintiff Cyrus Cezar is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

7.      Plaintiff Damon Crenshaw is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

8.      Plaintiff Cynthia Flores is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

9.      Plaintiff Tracy Foster is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

10.     Jasmin Galvan is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

11.     Debbie Kim is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

12.     Alexis Mckinney is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

13.     Laprea Pierce is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

14.     Amy Smith is an individual resident in the Northern District of Texas and can be served

through the undersigned counsel of record.

15.     Lakeisha Smith is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

16.     Nathan Tindall is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

17.     Eliseo Valdez is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

18.     Courtney Wadlow is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

19.     Cnaya Warren is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

20.     Sarah Shirley is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

21.     Joseph Adams is an individual resident in the Northern District of Texas and can be served through the undersigned counsel of record.

22.     Krista Adams is an individual resident of the state of Utah and can be served through the undersigned counsel of record.

23.     Jane and John Doe Bridge Plaintiffs 1-10 are individual residents in the Northern District of Texas who were participated in the "Bridge Incident" and can be served through the undersigned counsel of record.

**DEFENDANTS**

24.     Defendant the City of Dallas, Texas is a political subdivision of the State of Texas and funds, operates, and controls DPD. The City of Dallas, along with the Dallas City Council, Chief

Garcia, and Former Chief Hall, are (or were) responsible for implementing DPD's budget, policies, procedures, practices, and customs, and for the acts and omissions challenged by this suit. DPD under the direction of the Dallas City Council, Chief Garcia, and Former Chief Hall, is also responsible for preventive, investigative, and enforcement services for all citizens of the City of Dallas. Defendant the City of Dallas may be served with process by serving the Dallas City Attorney, Christopher J. Caso, at 1500 Marilla Street, Room 7DN, Dallas, Texas 75201; Phone (214) 670-3519 or Fax: (214) 670-3519.

25.     Chief Edgardo "Eddie" Garcia is the Chief of Police of DPD and a final policymaker for DPD, with the authority for setting policies, including training of DPD Officers. Chief Garcia may be served with process by serving the Dallas City Attorney, Christopher J. Caso, at 1500 Marilla Street, Room 7DN, Dallas, Texas 75201; Phone (214) 670- 3519 or Fax: (214) 670-3519.

26.     Between 2017 and 2020, Defendant Former Chief Ulysha "Renee" Hall was the Chief of Police of DPD and a final policymaker for DPD, with the authority for setting policies, including training of DPD Officers. *See Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) (the Fifth Circuit "[has] previously found that Texas police chiefs are final policymakers for their municipalities."). Chief Hall was also the supervisor for the DPD Officer Defendants at all times relevant in this complaint. Upon information and belief, Chief Hall is a resident of Maryland and may be served with process wherever she may be found.

27.     Defendants John and Jane Roe Officers 1-10 are certain individuals whose identities are presently unknown to Plaintiffs but who, upon information and belief, were at all relevant times DPD Officers and were acting in such capacity. Defendants John and Jane Roe 1-10 are responsible for the acts and omissions challenged by this lawsuit. Plaintiffs will amend this complaint to substitute the true names and capacities of the Defendants John and Jane Roe 1-10 when ascertained during this litigation.

28.     Defendant Dallas County, Texas is a political subdivision of the State of Texas, and funds,

operates, and controls the Dallas County Sheriff's Department. Dallas County, along with Sheriff Brown, is responsible for implementing the Sheriff's Department's budget, policies, procedures, practices, and customs, and for the acts and omissions challenged by this suit. The Sheriff's Department, under the direction of Dallas County and Sheriff Brown, is also responsible for preventive, investigative, and enforcement services for all citizens of Dallas County. Dallas County may be served with process the Dallas County Sheriff's Department at 133 N. Riverfront Blvd., LB-31, Dallas, TX 75207.

29.     Sheriff Brown is the Dallas County Sheriff and a final policymaker for the Sheriff's Department, with the authority for setting policies, including training of the Sheriff's Deputies. Sheriff Brown may be served with process by serving County Judge Clay Jenkins, 411 Elm Street, # 200, Dallas, Texas 75202; Phone (214) 653-7949.

30.     Defendants John and Jane Smith 1-10 are certain individuals whose identities are presently unknown to Plaintiffs but who, upon information and belief, were at all relevant times Sheriff's Deputies and were acting in such capacity. Defendants John and Jane Smith 1- 10 are responsible for the acts and omissions challenged by this lawsuit. Plaintiffs will amend this complaint to substitute the true names and capacities of the Defendants John and Jane Smith 1-10 when ascertained during this litigation.

31.     At all times pertinent, all Defendant Police Officers, Sheriff Deputies, State Troopers and Federal agents (collectively "Law Enforcement Officers") were acting with the consent and under the direction of Defendants City of Dallas and Chief Renee Hall.

### III.     JURISDICTION

32.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

33.     Federal jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

34.     The Court has general personal jurisdiction over the City of Dallas Defendants and the Dallas County Defendants by virtue of their citizenship and residence in Dallas County, Texas, as well as their continuous and systematic contacts with the State of Texas. Defendant the City of Dallas is a municipality incorporated in the State of Texas. Defendant Dallas County is a county in the State of Texas. Upon information and belief, the DPD Officer Defendants and Sheriff's Deputy Defendants are residents of the State of Texas.

35.     The Court has general personal jurisdiction over the State of Texas Defendants by virtue of their citizenship and residence in the State of Texas, as well as their continuous and systematic contacts with the State of Texas.

36.     Furthermore, the Court has specific personal jurisdiction over the City of Dallas Defendants, the Dallas County Defendants, the State of Texas Defendants, and Chief Hall because Plaintiffs' claims against them arise out of or relate to a contact between them and the State of Texas. The DPD Officer Defendants, Sheriff Deputy Defendants, State Trooper Defendants, and Federal Agent Defendants used excessive force against Plaintiffs during protests in Dallas, Texas, acting on orders and policies promulgated by Chief Hall and City of Dallas policymakers. Plaintiffs' claims against the City of Dallas Defendants, the Dallas County Defendants, the State of Texas Defendants and Chief Hall arise from that occurrence and Defendants' contact in the state of Texas.

## IV.     VENUE

37.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

38.     Venue in the Northern District of Texas-Dallas Division is proper pursuant to 28 U.S.C. §

1391 and 28 U.S.C. § 1367 as the incidents that give rise to this Complaint occurred in Dallas, Texas, within the Northern District of Texas.

## V.     CONDITIONS PRECEDENT

39.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

40.     All conditions precedent have occurred or have been performed. *See* Fed. R. Civ. P. 9(c).

## VI.     STATEMENT OF FACTS

### A.     The 2020 Protests in Dallas, Texas.

46.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

47.     On Monday, May 25, 2020, an unarmed Black man named George Floyd was murdered by an officer of the Minneapolis Police Department. The events of Mr. Floyd's arrest and murder were captured on video by multiple bystanders as well as individual officers' body cameras. Peaceful protests and demonstrations soon followed through the United States, including in Dallas, Texas.

48.     Undeterred by the fact that excessive police force was the very subject of these nationwide demonstrations, videos, photos, and reports of police brutality on massive scales at these protests arose in the weeks immediately following Mr. Floyd's death. Here in Dallas, DPD Officers, Sheriff's Deputies, and State Troopers repeatedly used extreme and lethal force against these crowds during the 2020 Protests, targeting peaceful, non-threatening protesters with tear gas, smoke bombs, flash-bangs, pepper balls, mace, and ammunition that are known as "kinetic impact projectiles," or "KIPs."

49.     KIPs, which include so-called "rubber bullets" or "sponge bullets," are often used by

American police forces to control crowds. The manufacturers, distributors, and sellers of these projectiles—and the police departments that use them against their own citizens—praise these bullets as being "nonlethal" or "less lethal." They are not. In fact, the fatality, morbidity, and significant risks of injuries from KIPs have been well documented, and KIPs kill approximately three percent of all people they strike. Regardless, in cities across the country, including Dallas, police departments attempted to quell participation in the 2020 Protests by firing KIPs into crowds, even though five decades of evidence shows such weapons can disable, disfigure, and even kill.

50.     In addition to pepper balls, KIPs, and tear gas, law enforcement agencies around the country, including DPD, have used an increasingly violent technique referred to as "kettling," wherein police officers block off streets and push or "corral" a group of protesters into a small area, like a bridge or city block, to restrict their movement. Thereafter, the police officers move in on the protesters to detain the individuals, arrest the individuals, or allow them to leave through an exit controlled by police.[6] In several instances, officers have held the protesters for hours without food, water or access to restrooms, and unnecessarily used tear gas, smoke bombs, rubber bullets, or other tactics against the kettled individuals in an attempt to "control" or "subdue" the crowd.

51.     Also, known as "trap and detain," this highly controversial technique routinely results in increased tensions between police and protesters who have been trapped in a small area. Originally developed as a military tactic, kettling was initially deployed by military forces in combat to subdue their opponent on the battlefield. Today, however, police departments use this same tactic against protesters, who in many cases are peacefully exercising their constitutional rights.

52.     Moreover, kettling results in the violation of the constitutional rights of peaceful protesters and other innocent bystanders, who are often swept up by police in their attempt to "control" the crowd. Rather than identify and single out the few bad actors, if any, officers engaged in kettling

indiscriminately target individuals in a general vicinity and subject them to the same antagonistic and even violent treatment, regardless of their individual conduct or participation in the protest. Kettling therefore infringes on individuals' First Amendment, Fourth Amendment, and Fourteenth Amendment rights, as protesters and other bystanders are wrongfully detained, arrested, and/or subjected to unreasonable searches, seizures, and excessive force while exercising their constitutional rights.

53.     In the immediate days after Mr. Floyd's death, federal courts in several cities, including Portland, Denver, and Oakland began issuing injunctive relief to prohibit law enforcement agencies from using so-called "less lethal" crowd control tactics on peaceful protesters, such as rubber bullets and tear gas.

54.     The first Dallas protest in the aftermath of Mr. Floyd's death was on May 29, 2020. On that day, and for hundreds of days after, peaceful protestors gathered in downtown Dallas to demonstrate against police brutality and racial inequality. Although a small minority of individuals present at the scene of the first weekend of protests engaged in destructive activity, including property destruction, those individuals' behavior was profoundly overshadowed by the thousands of otherwise non-violent, non-threatening demonstrators who peaceably exercised their First Amendment rights.

55.     Nonetheless, during the 2020 Protests, DPD and other law enforcement departments working with them and/or at DPD's direction (and invited by DPD and Former Chief Hall) directed extreme riot control tactics towards entire groups of protesters posing no harm to officers or anyone else. Dressed in riot gear and driving armored vehicles, DPD and those working with them kettled protestors, deployed riot control devices against ordinary citizens and journalists alike, without regard to whether the circumstances justified it, and shot "less lethal" weaponry at peaceful citizens.

56.     During the first seven days of demonstrations in Dallas, DPD Officers and those working

with them, including but not limited to the Sheriff's Deputies and State Troopers, and Federal Agents repeatedly used extreme and lethal force against crowds, directly targeting peaceful, non- threatening protestors with KIPs, tear gas, smoke bombs, and other riot control devices that the City of Dallas and Chief Hall praise as "less lethal." In particular, DPD and those working with them and/or at their direction used pepper balls and a type of KIP called 40mm eXact iMpact extended range "sponge" bullets—often referred to as "rubber bullets"—against protestors, bystanders, and journalists in order to suppress their First Amendment rights, without regard to constitutional limits.

57.     Chief Hall defended her decision and orders to shoot protesters with tear gas— a chemical weapon banned in war—during the 2020 Protests in Dallas. Hundreds of reports of peaceful protesters, journalists covering protests, and bystanders bleeding and suffering from unwarranted levels of force employed by law enforcement threaten to chill participation in ongoing demonstrations in Dallas.

58.     When DPD Officers and those working with them could not keep protestors moving in the direction they wanted, they called for additional officers with KIPs or tear gas in order to kettle protestors or alter their direction of travel. DPD Officers and those working with them regularly called for the use of tear gas to control the direction in which protestors were traveling. DPD Officers and those working with them often reported they could not kettle protestors exercising their First Amendment rights without the use of gas. DPD Officers and those working with them specifically used tear gas for the specific purpose of kettling crowds that were not apparently posing any direct or imminent threat.

59.     DPD Officers and those working with them were instructed to rush into crowds that were simply moving down the street in order to prevent them from continuing their protests. DPD Officers specifically reported that pepper ball rounds worked "very well" to  disburse protestors who were "agitated" but not apparently posing any threat.

60.     Upon information and belief, during the course of the 2020 Protests and specifically during the May 30, and June 1, 2020 protests in which Plaintiffs participated, Sheriff Deputy Defendants fired tear gas into crowds of protestors exercising their First Amendment rights when they did not pose a direct threat to any officers or property.

61.     Based on the DPD's After Action Report on the George Floyd Protest, several other law enforcement agencies played an active role in the events taking place on May

30, 2020 to June 1, 2020. On information and belief, Sheriff Deputy Defendants and State

Trooper Defendants (and others) also engaged in the challenged behavior, specifically kettling and shooting Plaintiffs with rubber bullet KIPs without provocation or justification, which violated their constitutional rights and resulted in injuries to one or more of the Plaintiffs.

62.     Plaintiffs and other non-threatening people present at the first weekend of 2020 Protests in Dallas from May 30 to June 1, 2020, suffered and continue to suffer from injuries caused by Defendants.

**B.      The Bridge Incident**

63.     On Monday, June 1, 2020, all Plaintiffs gathered for a peaceful protest in front of Lew Sterrett Justice Center to exercise their First Amendment rights and voice their concerns regarding recent instances of police brutality.

64.     While the rally was ongoing, DPD blocked all of the entrances and exits to the garage, so no Plaintiff or other protesters who were parked in the garage could leave. After the rally at Lew Sterrett Plaintiffs began marching along with other protesters.

65.     When the crowd's march reached the intersection with the roadway leading to the Bridge, they found that DPD positioned themselves and had stopped traffic so that protesters would enter the westbound ramp onto the Bridge as all other sides of the intersection were blocked by police. As the

Plaintiffs proceeded onto the Bridge, none received any instruction not to go on to the Bridge or a warning that they would be arrested or detained for doing so. Protesters were told by law enforcement to "continue moving" but were never warned not to walk up the ramp to the Bridge.

66.     As the peaceful protest continued, protestors were met by a line of law enforcement officers dressed in riot gear coming from the west side of the Bridge. The protesters including Plaintiffs, turned around to try to exit the bridge from the direction which they had entered.

67.     However, upon trying to vacate the bridge the protestors were met with another line of law enforcement officers in riot gear who blocked their exit from the bridge.

68.     Upon meeting the officers at the east end of the bridge, protestors stopped and peacefully stood while chanting. They put their hands in the air and chanted "Hands up! Don't shoot!" As the officers continued to advance eastward toward the protesters, they began to kneel with their hands up and continued to chant "Hands up! Don't shoot!"

69.     Then, all of the street lights on the Bridge simultaneously went out, which caused confusion and agitation amongst the protesters. During this commotion, law enforcement gave the protesters instructions to disperse and proceed home. Law enforcement officers did not, however, instruct the protesters as to how and in which direction they should disperse. Because the protesters were in the middle of the Bridge and surrounded by law enforcement officers on both sides who were blocking the protesters' means of exiting, the Plaintiffs, along with hundreds of other protesters were trapped with nowhere to go and no way to comply with the officers' instructions.

70.     After several minutes of confusion, and without provocation, law enforcement officers began firing into the crowd of protesters using pepper balls, flash-bangs, smoke bombs, tear gas, and KIPs causing protesters to run for cover on the Bridge.

71.     As a result of the pepper balls, smoke bombs, and tear gas, Plaintiffs were disoriented and unable to see. Which they were disabled, Law enforcement officers then closed in on Plaintiffs

FIRST AMENDED COMPLAINT                                                          Page **14** of 47

and them to get on the ground and advised that they were all being arrested. Law enforcement began to zip tie the Plaintiffs who were either sitting or laying down on their stomachs flat on the ground. Some had even been injured by the "less lethal ammunition" deployed by law enforcement officers.

72.     Plaintiffs were held unconstitutionally for over two hours on the Bridge before being finally released by law enforcement.

73.     The law enforcement officers had kettled Plaintiffs on the bridge. They began to tell the protestors to get on the ground and advised that they were all being arrested and began to zip tie the protestors who were laying down on their stomachs flat on the ground.

74.     At no point did any Plaintiff pose a threat of serious harm to any member of law enforcement or engage in criminal activity. Even when zip tied, Plaintiffs did not actively resist or attempt to evade by flight. Despite this, as a result of Defendants' policies and practices, however, Plaintiffs' constitutional rights were violated.

75.     DPD Officers, Sheriff's Deputies, State Troopers, and Federal Agents would eventually detain approximately 674 protesters on the Bridge at the end of the march from the Frank Crowley Courts Building downtown that was, by all accounts, entirely peaceful.

76.     The only violence on the Bridge came from DPD Officers, Sheriff's Deputies, State Troopers, and Federal Agents who fired so-called "less lethal" rubber bullets, along with pepper balls, smoke bombs, and tear gas, at nonthreatening, kneeling demonstrators who had been kettled by police. Assessing the incident the next day, Chief Hall said, "I strongly believe we made the right decisions to deter and disperse the large crowd on the bridge."

77.     But the DPD Officers Defendants, Sheriff Deputy Defendants, and State Trooper Defendants did **not** "deter" or "disperse" the crowd and instead deliberately **prevented** participants

from leaving by kettling them onto the Bridge.

78.     The conduct of DPD Officers, the Sheriff's Deputies, State Troopers, and Federal Agents particularly toward peaceful protestors, shows that Defendants are present at protests not simply to prevent property damage and keep the public safe but rather to retaliate against citizens for exercising their constitutional rights. Indeed, DPD Officers, Sheriff's Deputies, State Troopers, and Federal Agents and those working with them were and are dressed and armed to use violence against protestors, demonstrators, and bystanders. It is evident through their militaristic, indiscriminately violent conduct toward peaceful protesters, bystanders, press—and as widely captured on video— that Defendants were not present to serve a public safety role, but instead to dominate the protesters.

**C.      The City of Dallas uses KIPs and other "less lethal" force in a deadly manner— even when it violates the City of Dallas's own written polices and the U.S. Constitution.**

79.     KIPs—often called "rubber," "sponge," or "foam" bullets—describe a category of ammunition used commonly in crowd-control settings, and include pepper balls. Some KIPs are made of hardened foam or plastic, often containing a rigid or metal core. Others are "beanbag" type rounds, and others may be composed of rubber or wood.

80.     Regardless of their composition, these projectiles are shot out of guns at speeds comparable to that of a typical bullet, and when they hit their target, they can maim, blind, or even kill. Although police departments often use KIPs in crowd control because they claim they are allegedly "nonlethal" or "less lethal," research shows they cannot be used safely. At close range, they can break bones, fracture the skull[,] and explode the eyeball. If they hit the face, they can cause permanent damage and disability. And even at long distances, they have unpredicted trajectories, they bounce, and they're quite indiscriminate. In fact, some police departments prohibit KIP usage between 6 and 165 feet:

81.     An independent 2017 study found that these projectiles have caused significant morbidity

and mortality during the past 27 years, much of it from penetrative injuries and head, neck and torso trauma Given their inherent inaccuracy, potential for misuse and associated health consequences of severe injury, disability and death, KIPs do not appear to be appropriate weapons for use in crowd-control settings.

82.    That is why law enforcement experts are warning that rubber bullets should be used only to control 'an extremely dangerous crowd. And medical experts have stated "Shooting them into open crowds is reckless and dangerous."

83.    DPD purchased 40mm eXact iMpact extended range "sponge" bullets, confirming that DPD acquired KIPs. Yet, even though DPD has been purchasing them since at least 2013, the City of Dallas has never had *any* specific written policy regarding the use of sponge bullet or other KIPs fired from 40mm "Stinger" launchers. The City of Dallas was aware of the risk of severe injury from these sponge bullets. And DPD Officers have shown time and time again that they have never been properly trained—and, on information and belief, have never been trained at all— on when and how the use of these weapons is permitted by the United States Constitution. Yet DPD Officers and those working with them continue to use these extreme, deadly weapons against passive protestors never posing the immediate risk of serious harm the U.S. Constitution requires before officers may consider using deadly force.

84.    These egregious abuses during the 2020 Protests are not the first time the City of Dallas and Former Chief Hall discovered—and then ratified—officers' use of "less lethal" ammunition against peaceful protesters. After DPD Officers used pepper balls on a non- threatening crowd during the September 2018 protests following Botham Jean's murder by then- DPD Officer Amber Guyger, it became evident that the City of Dallas knew its officers violated written policies on the use of "less lethal" force and were untrained in the proper use of those weapons for crowd control.

85.    Like the 2020 Protests, none of the Botham Jean-related protestors were threatening any physical violence or property damage when they were shot with pepper balls— a direct violation of the DPD's General Orders prohibiting officers from using pepper balls unless the crowd was "threatening unlawful property damage or physical force." Indeed, Chief Hall admitted that she was concerned when she learned police fired the ammunition with no "immediate threat to the public" to justify their use under the General Orders. "The day after the protest, one of many after Jean's Sept. 6 death, Police Chief U. Renee Hall called for a review of the pepper- ball incident." In a written statement, Chief Hall admitted she had knowledge of the excessive force: "I am concerned to learn of reports that one of our officers deployed potentially several pepper balls during a demonstration last night. I have asked our investigative unit to conduct a full review. The use of pepper balls is governed by our General Orders, and they are only to be utilized if instructed to do so by the on-scene commander or if there is an immediate threat to the public. I plan to meet directly with the leadership of the demonstration to address their concerns."

86.    But Former Chief Hall took no action against the officers and instead reinforced the practice. Upon information and belief, no Internal Affairs investigation was ever conducted into that incident, nor was any additional training, supervision, or discipline ordered or provided

to DPD Officers regarding the use of pepper balls or the use of force as a means of crowd control in a protest setting after the 2018 Botham Jean demonstrations and before the 2020 Protests.

87.     The DPD General Orders governing the use of pepper balls at the time classified pepper balls "as hard empty hand control on the DPD Response Continuum," which requires a subject to exhibit only "defensive resistance," not the "aggravated aggression" required for deadly force. That policy, 902.0, further stated that pepper balls "[m]ay be used as saturation to disperse unruly or rioting crowds threatening unlawful property damage or physical force." The orders further state that "[t]he Pepper Ball System Area Saturation <u>will not</u> be used on subjects who are passively resisting or who are not posing a physical threat to persons/property to include persons fleeing the scene."

88.     None of the officers involved nor Chief Hall ever suggested the protesters were threatening unlawful property damage or physical force, or that they ever did more than passively resist, as the policy required. The only stated reason for shooting pepper balls at the crowd was "to keep protesters back" as the crowd turned onto Cadiz Street headed for the Dallas Police Association office.

89.     Nevertheless, the preliminary report of the incident review concluded that the use of the pepper ball gun "was 'consistent' with the department's general orders." The report also found that the officer seen on video firing the ammunition was not certified to use the gun at the time, and that his "certification on the gun had been expired for a year." And, although Chief Hall did not know the day after the incident whether the officer was instructed to use the weapon by the on-scene commander, the report found that a sergeant had instructed officers "to deny the crowd access to Cadiz Street." Ultimately, "the incident was treated as minor by the department."

90.     By approving of the use of pepper balls against a crowd that did no more than passively resist—and never threated to damage any property or use physical force—the City of Dallas

ratified the use of "less lethal" ammunition that directly violated the DPD General Orders. The Jean incident showed not only that officers not qualified to use less lethal ammunition are instructed to do so anyway, but that even when that unqualified officer predictably uses the weapon in a way that violates written policy, City of Dallas officials simply deny that the policy says what it says. And even though the Jean incident made it plain that officers were in need of training to use these "less lethal" guns for crowd control only in ways actually "consistent" with the City of Dallas's policies, the City of Dallashas never given officers training on the matter. Therefore, the City of Dallas's *de facto* policy improperly and unconstitutionally allows police to use "less lethal" ammunition against non-threatening crowds, including non-threatening protestors.

91.     Despite knowing that officers were not trained to follow the City of Dallas's written policies regarding pepper balls, and having ratified the custom of using such extreme force against non-threatening protestors as official policy, the City of Dallas chose to purchase and arm officers with another form of "less lethal" ammunition without enacting any general order to ensure the constitutional use of the weapon, or even providing officers any training in how to do so. It was obvious that "the highly predictable consequence of not training" DPD Officers was that they "would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk." *Brown v. Bryan County, Okla.*, 219 F.3d 450, 461 (5th Cir. 2000), *reh'g denied*, 235 F.3d 944 (5th Cir. 2000). The City of Dallas has an established pattern and practice of usingexcessive, potentially lethal force to disperse non-violent peaceful crowds and protestors in Dallas.

92.     The City of Dallas and Chief Hall knew from the Jean protests that officers were not trained on the proper use of "less lethal" pepper ball KIPs for crowd control when the City of Dallas contracted to use "sponge rounds." But instead of training officers accordingly, the City of Dallas added another "less lethal" KIP to officers' arsenal. Even though the "sponge" bullets are even more harmful than pepper balls, the City of Dallas ignored the increased danger they pose to citizens by providing officers no

additional training on how to use the sponge bullets. And at no time has the City of Dallas, Chief Garcia, or Former Chief Hall established a general order or written policy specific to the more dangerous sponge bullets and corresponding weapons.

93.     The City of Dallas can hardly be surprised that when groups gathered again in Dallas in 2020 to peacefully protest that DPD Officers would again use "less lethal" munitions to control the crowd—ignoring whether the crowd posed any actual threat of harm, let alone an immediate threat of serious harm to persons. When DPD Officers and those working with them trapped Plaintiffs and the hundreds of peaceful protesters on the Bridge on June 1, 2020, the crowd that police fired directly into—like crowds in the Jean incident—had not and did not riot and never threatened property damage or physical force, as journalists on the scene and video footage of the events confirm.

94.     The weapons DPD Officers and those working with them used to control non- threatening crowds of protestors during the 2020 Protests are even more lethal than claimed. The protestors on the Bridge on June 1, 2020, not only knelt and raised their hands, but they were also retreating. Some protesters even turned their backs and began running away from the advancing officers. Still, police stalked and kettled protesters down the Bridge and again shot pepper balls and KIPs directly at protesters, without provocation. The Jordan Family tried to leave, but were prevented from doing so by law enforcement before they were then kettled onto the Bridge.

95.     When faced with plain instances of DPD Officers and those working with them violating the constitutional limits of force and the  City of Dallas's own written policies, the City of Dallas and Chief Hall have encouraged and defended the practice, deterring protesters from attending future protests. In doing so, the City of Dallas and Chief Hall reaffirmed the City of Dallas's official unwritten policy and practice of using excessive, potentially deadly, force against non-threatening, peaceful protesters as a means of intimidation and control, and to prevent citizens like the Jordan Family from exercising their

constitutional rights.

96.     On its face, however, the City of Dallas's own use of force policy recognizes that treating KIPs and pepper balls as anything less than deadly force is unconstitutional. In the 2016 General Orders, the City of Dallas's Response Continuum Policy 901.04 on "Levels of Control" expressly defines "deadly force" as: "Deadly Force: The use of physical control that will cause death or serious bodily injury." The policy then mandates that "Deadly Force will only be employed in accordance with the Department's Deadly Force Policy (refer to Section 906.00)." As explained above—and as Plaintiffs experienced firsthand—KIPs and pepper balls cause serious bodily injury. Thus, pepper balls and KIPs from the 40mm launcher should have been defined as deadly force according to the City of Dallas's other policies. And because the U.S. Constitution bars officers from using deadly force except where there is an "immediate threat" of harm to the officer or others, by not classifying KIPs and pepper balls as deadly force, the City of Dallas's policies on those "less lethal" weapons are facially unconstitutional.

97.     Furthermore, by failing to train DPD Officers and others working with them to use pepper balls and KIPs shot from the 40mm launcher in accordance with the City of Dallas's deadly force policy—and indeed, actively training officers to use the devices where deadly force would be prohibited by the U.S. Constitution and the City of Dallas's own policy—the City of Dallas has established that its unwritten policies on KIPs and Pepper balls are unconstitutional.

**D.      Amid the ongoing 2020 Protests and the Bridge incident in Dallas and nationwide, Defendants refused to acknowledge failures.**

98.     In the days after the incidents that injured Plaintiffs, Former Chief Hall confirmed what so many citizens and Plaintiffs have long known: the City of Dallas's current use of force policies are insufficient to "address challenges between law enforcement and communities of color." Public outrage over the June 1, 2020 Bridge incident prompted Dallas residents to demand Chief Hall's

resignation. When Mayor Eric Johnson asked her "Where would you say the buck stops in the Dallas Police Department?" Hall replied: "It stops with me." Former Chief Hall has not recanted her statement defending officers' actions at the Bridge under the guise of "protect[ing] protesters from vehicular injury on a roadway still open to traffic." Tellingly, after arresting protestors on the Bridge (purportedly for obstructing a highway or for violating the curfew ordinance; protesters were not clear why they were being arrested), Former Chief Hall dropped all charges—but only *after* demonstrators were successfully intimidated and deterred from exercising their First Amendment rights and only *after* Plaintiffs and hundreds of others were unconstitutionally seized, held, and injured by Defendants.

99.     In what has been called "the worst city council meeting Dallas has witnessed in a decade," Dallas Mayor Eric Johnson grilled Chief Hall about the incident on the Bridge and challenged her claim that officers did not tear gas protestors. "Hall said tear gas was not fired, that it was smoke. She said she ordered the SWAT team to not fire tear gas. Mayor Johnson then wanted to know the chemical breakdown in the smoke. She could not say. Councilman Adam Medrano said he believed Chief Hall's order to not fire tear gas was disobeyed, because the reactions of those on the Bridge was so violent. He demanded that she determine who violated her order." Across America, cities continue to announce plans to consider significant changes in police protocol and, indeed, whether to limit the extent and funding of police departments as a whole. "A growing number of people suffering serious injuries  in  Dallas, Austin and across the nation from plastic, rubber and wooden bullets are raising new questions about how and when police officers use these weapons." On June 9, 2020, Austin's police chief "banned the use of these weapons for crowd control purposes after a 20-year-old black man, a Latino teenager and a pregnant woman were critically injured."

100.     Under this constant pressure, Chief Hall announced on Thursday, June 4, 2020, that she "had instituted a new general order compelling members of the department — both sworn and non-

sworn—'to either stop, or attempt to stop, another employee when force is being inappropriately applied or is no longer required.'" Then on Monday, June 8, 2020, Chief Hall officially banned chokeholds and "said next week the Dallas Police Department will institute a policy requiring officers to announce warnings before shooting." Chief Hall said DPD would institute a policy requiring police to announce warnings before shooting, "to release more dash cam and body cam videos as well as order a review all use of force policies." Yet, the policies enacted thereafter still do not address the use of KIPs and other riot control devices as general "crowd control" or the use of kettling against peaceful protestors.

101.    On July 22, 2020, Dallas independent news media Central Track reported that DPD had apparently completed its "Preliminary After-Action Report" on the first four days of the 2020 Protests (which DPD calls the "Protests for Equality") as early as June 12, 2020. After the report was leaked by a City Hall employee, Central Track published it on July 22, 2020.

102. On August 14, 2020, DPD released its final "George Floyd Protests After Action Report" (the "After-Action Report"). The After-Action Report reveals several notable details about the first four days of protests:

a.    DPD admits that "during a review of the use of force and through the recognition that existing General Orders were vague on the deployment of less- than-lethal projectiles during crowd control incidents, General Orders 902.02 and 908.04 were created to ensure Pepperball launchers and 40mm Less Lethal "Stingers" are not deployed into crowds in the future";

b.    The report also makes "clear mention about the use of teargas on the protesters arrested on the bridge on June 1," despite Chief Hall's continued denial that tear gas was used;

c.    DPD estimates that SWAT officers deployed at least 335 projectiles from the 40mm launcher, 36 Pepper balls, and 30 tear gas canisters, while claiming that DPD patrol officers used 68 Pepper balls and 40mm KIPs;

d.    It is likely that those estimates are low, given that DPD admits it was not fully tracking the police resources it was expending, noting that many officers were "freelancing," which the report then describes as "the spontaneous reaction to an observed need for action." The report notes that such officer activity "made tracking police resources extremely difficult."

e.   Tragically, the report admits that "the standard operating procedure of creating a highly visible officer presence for managing crowd control incited the emotions of the protests";

f.   Reportedly, the efforts by DPD cost taxpayers "$920,000 in salaries and overtime, $377,000 in goods, equipment and services, and $215,000 in vehicle usage and damage."

103.   Although the City of Dallas, for the first time, recently enacted a policy regarding the "40mm 'Stinger' Less Lethal Launcher System," the new policy makes plain that DPD still Roes not hold officers' use of KIPs to a lethal force standard. For instance, the policy permits officers to fire KIPs using the 40mm launcher at a suspect who is "not actively aggressive." But under the Use-of-Force Continuum, deadly force is not permitted even against someone who is actively aggressive; "aggravated aggressive" conduct is required. The policy Roes not even demand that the suspect pose an actual danger at the time, but rather, allows officers to fire KIPs at a suspect who is "moving to an area that is potentially more dangerous to himself or others." Ultimately, the policy requires no "immediate" threat of harm to shoot the KIPs directly at a person. However, none of these policies address the real problem here: the City of Dallas refuses to hold "less lethal" KIPs and pepper balls to the standard for lethal force, even though they cause serious injuries and even death.

104.   Upon information and belief, to date, neither the City of Dallas nor Chief Hall terminated any of the Jane or John Roe Police Officers, or any other DPD Officers present or working during the 2020 Protests, nor have they required that these officers be disciplined, have additional supervision, or undergo additional training. By doing so, the City of Dallas and Chief Hall ratified and tacitly approved of their conduct.

105.   Upon information and belief, to date, the Dallas County Defendants, State of Texas Defendants nor Federal Defendants have terminated any of the John and Jane Smith Sheriff's Deputies, John and Jane White State Troopers, present or working during the 2020 Protests, nor have they required that these Deputies or Troopers be disciplined, have additional supervision, or

undergo additional training. By doing so, the Sheriff Brown, DPS, and DPS Director Steven C. McCraw ratified and tacitly approved of their conduct.

## VII.   CAUSES OF ACTION

### A.   FIRST AMENDMENT VIOLATION
COUNT ONE – 42 U.S.C. § 1983
(City of Dallas Defendants)

106.    Plaintiffs by reference incorporate and reallege all of the preceding paragraphs as though fully stated herein.

107.    Plaintiffs engaged in constitutionally protected acts of observing, recording, or participating in events of public interest, including public demonstrations and expressing their political views. Plaintiffs will continue to do so in the future.

108.    In 2018, Former Chief Hall admitted that she knew "less lethal" ammunition was being used against peaceful protestors who were not threatening to commit property damage or physical violence but encouraged and defended the practice because it dispersed the crowds.

109.    The actions of the City of Dallas Defendants, the suppression of a peaceful demonstration and the viewpoint it represented—and the actions of Chief Hall in ordering such suppression—deprived Plaintiffs of their rights under the First Amendment to the U.S. Constitution to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances. The City of Dallas Defendants deliberately violated well-established protections for the exercise of speech and assembly in public places.

110.    The City of Dallas Defendants retaliated against Plaintiffs for engaging in constitutionally protected activity and for the content and viewpoint of their expressions. The City of Dallas Defendants' and Chief Hall's retaliation is part of a pattern or practice of unconstitutional conduct that is highly likely to continue absent relief.

111.     The City of Dallas Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest justifying the infringement of Plaintiffs' First Amendment rights. Even assuming, arguendo, that there had been a compelling government interest in protecting against property damage or clearing streets of protestors, the City of Dallas Defendants' actions toward Plaintiffs and the groups of protesters were not narrowly tailored to serve that government interest in a lawful manner.

112.     Plaintiffs reasonably fear the continued indiscriminate use of KIPs and deployment of chemical agents by Defendants without warning. Plaintiffs further reasonably fear unlawful seizure and excessive force through the firing of flash bang grenades, KIPs and other projectiles, and other means if Plaintiffs and protesters continue to engage in constitutionally protected activity.

113.     These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs from continuing to observe and record some events of public interest and to participate in peaceful protests. The City of Dallas Defendants acted with reckless or callous indifference to the constitutionally protected rights of Plaintiffs.

114.     It was the City of Dallas Defendants' custom and policy, as well as the City of Dallas Defendants' failure to train and supervise DPD Officers and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

115.     The City of Dallas Defendants' continued failure to supervise and train DPD Officers with respect to the First Amendment rights of Plaintiffs amounts to deliberate indifference to the rights of Plaintiffs.

116.     Dallas has a long history of violating First Amendment rights of protesters,

117.     Defendant City of Dallas and/or Defendant Hall are liable for the constitutional violations

described herein because the violations arose from a persistent, widespread pattern or practice of falsely arresting and charging peaceful protestors with false charges.

118.    The pattern of similar constitutional violations against Plaintiffs and other protesters that occurred during the 2018 and 2020 Protests demonstrates the deliberate indifference of the City of Dallas Defendants to the rights of Plaintiffs and other protesters.

119.    Further, given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City of Dallas Defendants demonstrated their deliberate indifference to the need for such training and supervision.

120.    Plaintiffs' First Amendment rights were violated when they were deliberately targeted and shot with KIPs, pepper balls, tear gas, flashbang grenades, and smoke during the course of their protest activities.

121.    Plaintiffs reasonably fear further retaliation in the future if they continue to observe, record, or participate in constitutionally protected activity.

122.    The City of Dallas Defendants intentionally and with reckless disregard caused the injury of Plaintiffs by means of the DPD Officer Defendants' use of physical force to suppress free speech, which was instructed or authorized by Chief Hall. These actions or omissions were the direct result of the City of Dallas's written and unwritten policies.

123.    As a direct and proximate result of the acts and omissions of the City of Dallas Defendants while acting under color state law, Plaintiffs were deprived of their First Amendment rights to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

## B.    EXCESSIVE FORCE
### COUNT TWO – 42 U.S.C. § 1983 (Against DPD Officer Defendants)

124.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

125.    At all times alleged herein, DPD Officer Defendants were sworn police officers with the DPD, and acting under color of law.

126.    At all relevant times alleged herein, no citizen, officer, or bystander was in imminent fear for their life or in fear of the Plaintiffs causing them serious bodily injury.

127.    At all relevant times alleged herein, Plaintiffs never threatened to harm any property.

128.    At all relevant times, Plaintiffs possessed the right to be free from excessive force.

129.    Former Chief Hall instituted a policy and practice of using excessive force against non-threatening, peaceful protesters as a means of intimidation and control.

130.    The DPD Officer Defendants used unreasonable force when Plaintiffs did not pose an imminent threat of death or serious bodily injury to the DPD Officer Defendants or any other person during the relevant time alleged herein.

131.    The DPD Officer Defendants further used objectively unreasonable force when Plaintiffs did not pose any threat of harm to property during the relevant time alleged herein.

132.    Using physical force such as KIPs—including rubber, sponge, or pepper bullets— against a non-threatening individual is unreasonable and violates the Fourth Amendment. Given the gross disparity between the need for force and the level of pain and injury inflicted, the DPD Officer Defendants' use of force was also malicious and intentional

133.    Plaintiffs' right to be free from the use of excessive force is clearly established and has been for decades. Plaintiffs committed no crime, posed no threat to anyone's safety, and did not resist the DPD Officer Defendants or fail to comply with a command.

134.    Officers must undertake risk assessment and de-escalation, including warning before using

force that can kill.

135.    The force used by the DPD Officer Defendants was objectively unnecessary, excessive, and unreasonable under the circumstances, as Plaintiffs did not pose an immediate threat to the safety of the DPD Officer Defendants, and the use of such excessive force was unjustified. Rather, the DPD Officer Defendants embarked on a willful, malicious, reckless, and outrageous course of conduct that was intended to cause and, in fact, did cause Plaintiffs to suffer:

(1) physical injury; (2) extreme and severe mental and emotional distress, agony, and anxiety; and (3) deprivations of their constitutional rights.

136.    The DPD Officer Defendants did not need to fire KIPs at a non-threatening peaceful crowd, let alone at Plaintiffs—who had tried to leave the protests and were prevented from doing so by DPD Officers and those working with them. Moreover, the use of KIPs bullets was unwarranted and excessive to the articulated need of dispersing protesters from the Bridge and from downtown Dallas, and excessive to the purported needs of effectuating arrest or crowd control.

137.    Likewise, the DPD Officer Defendants' use of force was inappropriate and unwarranted as a use of crowd control for peaceful, non-threating participants in protests, in violation of the Plaintiffs' Fourteenth Amendment rights to due process.

138.    Moreover, no reasonably competent official would have concluded that the actions of the DPD Officer Defendants described herein would not violate Plaintiffs' constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that the conduct of the DPD Officer Defendants was constitutionally permissible or that the treatment of Plaintiffs was reasonable, particularly under the egregious circumstances of using force against Plaintiffs who did nothing to warrant using *any* force at all.

139.    As a result of these violations of Plaintiffs' constitutional rights and the injuries they

sustained as result of the DPD Officer Defendants' actions while acting under color state law, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### C.      EXCESSIVE FORCE
### COUNT THREE – 42 U.S.C. § 1983
### (Against Defendant City of Dallas)

140.    The City of Dallas is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 704 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of DPD of which the City Council, the City Manager, the Mayor, and Chief Hall all had actual or constructive knowledge and which was a moving force behind the constitutional violations alleged herein.

141.    The excessive force used by the DPD Officer Defendants is the direct result of the City of Dallas's *de facto* unwritten policy that allows police to use "less lethal"—but not "nonlethal" – ammunition and devices against a crowd, including against protesters who are not immediately threatening serious physical injury. The City of Dallas has known, since at least the 2018 protests following Botham Jean's death, of the obvious risk that KIPs would cause the type of constitutional violations and physical injuries that Plaintiffs have suffered. And the City of Dallas has used sponge/rubber bullet KIPs since at least 2013. Yet the City has never developed any written or unwritten policy regarding the constitutional use of the KIPs and, thus, it was highly predictable that DPD Officers would continue to violate protesters', bystanders', journalists', and citizens' (like Plaintiffs) constitutional rights using sponge/rubber and other KIPs. Accordingly, the City of Dallas Defendants have been deliberately indifferent to the complete lack of training, or completely inadequate training, they have given DPD Officers on these "less lethal" forms of ammunition.

142.    The written and unwritten policies of the City of Dallas, therefore, are the moving forces

behind the constitutional violations inflicted on Plaintiffs through the excessive force of the DPD Officer Defendants.

143.    As a direct and proximate cause of the DPD Officer Defendants' use of excessive force while acting under color state law, Plaintiffs suffered and continue to suffer severe injuries including, but not limited to, emotional distress and physical pain and suffering.

### D.    UNLAWFUL SEIZURE
### COUNT FOUR – 42 U.S.C. § 1983
### (Against Law Enforcement Defendants)

144.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

145.    Plaintiffs were seized by the Law Enforcement Officer Defendants when LE Officers prevented Plaintiffs from leaving the Frank Crowley Courts Building following the peaceful protest that took place there on June 1, 2020.

146.    Plaintiffs were further seized by the LE Officer Defendants when Officers willfully, through the use of force and threat of arrest, chemical agents, KIPs and other projectiles, "kettling," and other riot control tactics, terminated Plaintiffs' freedom of movement.

147.    The LE Officer Defendants committed these acts without forewarning or justification and, as a result, the LE Officer Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

148.    At all times relevant, Plaintiffs did not commit a crime.

149.    At all times relevant, Plaintiffs did not pose a threat to any of the LE Officer Defendants, to Plaintiffs themselves, or to any other person.

150.    It was the City of Dallas's custom and policy, as well as the City of Dallas's and Chief Hall's failure to train, supervise, and discipline its officers or issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

151.    Plaintiffs' Fourth Amendment rights were violated when they were deliberately targeted and shot with KIPs, pepper balls, tear gas, flashbang grenades, and pepper spray during the course of Plaintiffs' lawful protests and presence at the protests. Because DPD Officers actively threatened Plaintiffs with these "less lethal" weapons throughout their encounters with DPD, Plaintiffs were not free to leave without such physical force being used against them.

152.    Plaintiffs reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

153.    It is the pattern and practice of the City of Dallas and Chief Hall to arrest but not charge protesters as a means to suppress First Amendment rights. As explained above, it is also the City of Dallas's *de facto* unwritten policy for police to use "less lethal"—but not "nonlethal"— ammunition and devices against a crowd, including against protesters who are not immediately threatening serious physical injury.

154.    It is also the City of Dallas' policy, whether written or *de facto*, to employ kettling techniques against peaceful protesters in order to dominate, control, and unlawfully seize protesters. DPD Officers are trained to operate in formation "in order to disperse or control an unruly crowd." Specifically, DPD Officers are trained to operate in Mobile Field Force Units to "remove those involved citizens who are agitating the crowd" by facing the crowd in a line and to utilize "flanking movements" to change the Mobile Force Unit's forward motion toward crowds. DPD Officers are also specifically trained that, when employing a Mobile Field Force, "[c]rowds must be allowed an avenue of departure[.]" Yet no such avenue of departure was available on June 1, 2020.

155.    In its After Action Report, DPD indicted that its modifications of standard responses to "unlawful assemblies" required "officers to create paths for dispersing crowds without creating an opportunity for increased confrontation." DPD stated that its officers "were close enough to create

direction, without being so close as to create a target." These statements are, at the very least, inconsistent with DPD Officer Defendants' actions on the Bridge.

156.     These written and unwritten policies of the City of Dallas, therefore, are the moving forces behind the unconstitutional seizures suffered by Plaintiffs in violation of their Fourth Amendment rights.

157.     As a direct and proximate result of the LE Officer Defendants' acts and omissions while acting under color state law as stated above, Plaintiffs were deprived of their Fourth Amendment rights and suffered injuries and damages.

**E.     <u>FAILURE TO SUPERVISE OR DISCIPLINE</u>**
**COUNT FIVE – 42 U.S.C. § 1983**
**(Against Defendant City of Dallas)**

158.     Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

159.     The City of Dallas and Chief Hall are directly responsible for supervising police officers in the use of physical and lethal force and for disciplining police officers for using force that violates City of Dallas policies or the Unites States Constitution.

160.     The City of Dallas and Chief Hall knew at least as early as 2018 that DPD Officers were using KIPs like Pepper balls as a means of crowd control for non-threatening protestors in violation of the DPD General Orders and the United States Constitution. But the City of Dallas and Chief Hall deliberately chose not to supervise DPD Officers to ensure they were only using KIPs within constitutional limits. The City of Dallas and Chief Hall also failed to discipline officers who used KIPs against non-threatening protesters or to discipline officers who used KIPs in a manner that violated the General Orders and the Constitution. Instead, Chief Hall further authorized the unsafe use of KIPs and authorized the further use of the ammunition on peaceful, non-threatening,

protestors, as a means of crowd control and to deter the exercise of Plaintiffs' First Amendment rights. This constituted deliberate indifference toward the outrageous and reckless use of force.

161.    The City of Dallas and Chief Hall also knew of the risks associated with the 40mm eXact iMpact extended range sponge round, including incapacitation, and significant injury. But the City of Dallas and Chief Hall also failed to take disciplinary action in response to the unlawful use of KIPs against non-threatening crowds protesting the death of George Floyd in 2020. The City of Dallas and Chief Hall also failed to take disciplinary action in response to officers using KIPs for crowd control in an unlawful manner that was likely to cause serious injuries and, possibly, death.

162.    Although the City of Dallas has used sponge and/or rubber bullet KIPs since at least 2013, and the City of Dallas issued General Orders for less lethal Pepper Ball KIPs by 2016 at the latest, the City of Dallas and Chief Hall have never issued General Orders regarding sponge and/or rubber bullet KIPs. Likewise, Chief Hall and the City of Dallas ratified the use of Pepper Ball KIPs against non-threatening protestors in violation of those General Orders. Upon information and belief, to date, none of the DPD Officer Defendants have been terminated, disciplined, required to have additional supervision, or required to undergo additional training. Accordingly, given that Chief Hall did not discipline or supervise virtually all of the DPD Officers who used sponge and/or rubber bullet KIPs or pepper balls against Plaintiffs and other non-threatening protesters, it is reasonable to infer that in the eyes of the City of Dallas and Chief Hall, the officers' illegal conduct actually conformed with the City of Dallas's policy.

163.    These written and unwritten policies of the City of Dallas are, therefore, the moving forces behind the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

164.    As a direct and proximate result of the DPD Officer Defendants' acts and omissions while acting under color state law as stated above, Plaintiffs were deprived of their Fourth and Fourteenth Amendment rights and suffered injuries and damages.

### F.    FAILURE TO TRAIN
### COUNT SIX – 42 U.S.C. § 1983
### (Against Defendant City of Dallas)

165.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

166.    The City of Dallas and Chief Hall are directly responsible for training on the use of firearms with regard to lethal and allegedly less lethal impact weapons, the manner of use, distance of use, and use of force continuum.

167.    Chief Hall had direct supervisory and policymaking responsibilities for police officers in the use of physical and lethal force.

168.    Chief Hall knew of the risks associated with the 40 mm eXact iMpact extended range sponge round but failed to institute any training with regard to the range and risks of certain incapacitation, or significant injury.

169.    Chief Hall and the City of Dallas knew that as of 2018, DPD Officers were using KIPs and pepper balls as a means of crowd control for non-threatening protestors in violation of DPD General Orders and the U.S. Constitution. But Chief Hall and the Dallas City Council deliberately chose not to train DPD Officers regarding the threat level necessary to justify using the pepper balls or other KIPs against a crowd within constitutional limits on the use of force. Instead, Chief Hall further authorized their use and authorized the further use of such ammunition toward peaceful, non-threatening protestors as a means of crowd control and to deter the exercise of Plaintiffs' First Amendment rights. This constitutes deliberate indifference and outrageous and reckless use of force.

170.    The City of Dallas, the Dallas City Council and Chief Hall also knew of the risks associated with the 40mm eXact iMpact extended range sponge round, including incapacitation, and

significant injury. But the City of Dallas and Chief Hall also failed to train officers in the threat level necessary to justify using the sponge bullet KIPs against crowds within the constitutional limits on the use of force. The City of Dallas and Chief Hall also failed to train officers to use KIPs in manners unlikely to cause serious injuries and death.

171.    Even after the abuses of pepper ball KIPs in 2018, Chief Hall, the City of Dallas and the Dallas City Council ratified the use of pepper ball KIPs against non-threatening protestors in violation of applicable DPD General Orders and the U.S. Constitution. The City of Dallas, the Dallas City Council, and Chief Hall actually knew or should have known that their approach has failed to prevent unconstitutional conduct by DPD Officers. The City of Dallas, the Dallas City Council, and Chief Hall's continued approval of using KIPs in violation of DPD General Orders and the U.S. Constitution demonstrates the conscious disregard the City of Dallas and Chief Hall have for the consequences of their actions.

172.    The need for training officers in how to use KIPs lawfully—particularly where no training has been provided—could hardly have been more obvious to the City of Dallas, the Dallas City Council, or Chief Hall since at least the unlawful use of KIPs against crowds in the 2018 protests following Botham Jean's death. Absent such training, it was highly predictable that DPD Officers would continue to violate Plaintiffs' and other protesters' constitutional rights. Accordingly, the City of Dallas, the Dallas City Council, and Chief Hall were deliberately indifferent to the complete lack of training, or completely inadequate training, they have given DPD Officers.

ALLEGED POLICIES, PRACTICES AND PROCEDURES LEADING TO VIOLATIONS OF PLAINTIFF'S RIGHTS

173.    Defendant Officers, acting under color of law and acting pursuant to customs, practices and policies of The City of Dallas and DPD in regards to unlawful detention/false arrest, as authorized and/or ratified by the City, deprived Plaintiff of rights and privileges secured to him by

the First, Fourth, and Fourteenth Amendments to the United States Constitution and by other laws of the United States.

174.    By failing to provide proper training in the elements of criminal charges, including disorderly conduct and resisting arrest, the DPD and City exhibited deliberate indifference to an obvious need for training.  With respect to the claims made the basis of this lawsuit, the City's failure to train its employees in a relevant respect reflects a deliberate indifference to the rights of the city's inhabitants and is actionable under 42 U.S.C. § 1983.

175.    47.    Defendant City of Dallas and DPD under the direction of the Dallas City Council developed and maintained a policy of deficient training of its police force in understanding the elements of criminal charges and First Amendment rights.

176.    48.    Any reasonably trained officer would not take a person into custody without probable cause that they were committing a crime.

177.    49.    The City and DPD's failure to provide adequate training to its police officers regarding elements of criminal charges and First and Fourth Amendment rights reflects deliberate indifference by of the City and reckless and conscious disregard for the obvious risk that officers would unconstitutionally arrest and detain citizens and violate First Amendment rights made the violations of Plaintiff's constitutional rights, a reasonable probability.

178.    Plaintiff would show that Defendant Officers' actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the City knew or should have known that conduct such as that evidenced in the instant case was likely to occur, but never provided the requisite and proper training that would have prevented it.

179.    Upon information and belief, Defendant City, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights

of Plaintiff, failed to implement the policies, procedures; and practices necessary to provide constitutionally adequate protection to Plaintiff and implemented policies, procedures, and practices which were the moving force behind the violation of his constitutional rights.

180.   For instance, the following conduct, policies, and customs, *inter alia*, by Defendants violated Plaintiff's constitutional rights:

> a. The City's failure to adequately train its officers on the Texas criminal code elements of charges and First and Fourth Amendment rights;
>
> b. DPD's failure to properly supervise Defendant Officers to assure that they did not violate citizens' rights.
>
> c. DPD's failure to discipline or terminate officers for non-compliance with policy;

181.   The City of Dallas also had a duty to properly supervise its police officers to assure that they comply with the law and do not violate citizen rights.

182.   Defendant failed to properly supervise its officers.

183.   Plaintiff was arrested without any resistance from the Chief of Police. Instead of supervising and assuring that DPD officers did not violate citizens' rights, the Dallas Chief of police simply sat idly by as the violations occurred.

184.   The City's failure to properly train/supervise/discipline its police officers regarding the elements of criminal charges and First and Second Amendment rights was the proximate cause of the violations of Plaintiff's constitutional rights

185.   These written and unwritten policies of the City of Dallas are the moving forces behind the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

186.   As a direct and proximate result of the City of Dallas and Chief Hall's acts and omissions while acting under color state law as stated above, Plaintiffs were deprived of their Fourth and Fourteenth Amendment rights and suffered injuries and damages.

### G.     PERMANENT INJUNCTIVE RELIEF
**COUNT SEVEN – 42 U.S.C. § 1983**
**(Against City of Dallas Defendants)**

187.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

188.    Additionally, and in the alternative, Plaintiffs are entitled to permanent injunctive relief against the City of Dallas Defendants.

189.    Plaintiffs have suffered irreparable injury as a result of the City of Dallas Defendants' conduct, and the failure to grant permanent injunctive relief will result in further irreparable injury. The violation of constitutional rights constitutes irreparable harm, particularly where the First Amendment is concerned. Loss of First Amendment freedoms—even for minimal periods of time—constitutes irreparable injury. As demonstrated herein, the actions of DPD Officers and those working with them, authorized and directed by the City of Dallas, the Dallas City Council and Chief Hall, have had the effect of blocking demonstrators, bystanders, and press from fully exercising their First Amendment rights. Additionally, the City of Dallas Defendants' actions chill Plaintiffs' prospective exercise of their rights.

190.    The City of Dallas Defendants' tactics also caused and continue to cause irreparable harm under the Fourth Amendment. It is well-established that using deadly force against a person who Roes not pose an immediate threat of serious harm violates that person's Fourth Amendment right to be free from excessive force. Firing weapons that—although allegedly "*less* lethal" than firearm rounds are nonetheless *still* lethal—constitutes excessive force when used against people who pose no immediate threat of serious harm at the time. Plaintiffs and other protesters, bystanders, and press will continue to face excessive deadly force unless the City of Dallas Defendants and those working with them are enjoined from using such weapons against people who pose no immediate threat of

serious harm at the time.

191.    The City of Dallas Defendants' policies and practices have been overbroad and underinclusive: rather than focus on arresting, DPD Officers and those working with them have hurled canisters of tear gas and smoke at entire crowds of peaceful protesters and indiscriminately fired KIPs at individual protesters not involved in any conduct that posed an immediate threat of serious harm at the time. The use of such excessive deadly force is not "narrowly tailored" and necessary for keeping roadways clear or for preventing property destruction—neither of which are compelling. Thus, the City of Dallas Defendants' policies and practices do not survive strict scrutiny. Further, since the City of Dallas Defendants' force is directed squarely at suppressing free expression—and restricts First Amendment freedoms far more than necessary to prevent an immediate threat of serious harm at the time—the policies and practices also fail intermediate scrutiny. The City of Dallas Defendants' actions also violate the Fourth Amendment prohibition on excessive force and the First Amendment rights at stake strengthen that claim. The City of Dallas Defendants' authorization of the use of allegedly "less lethal" weapons against protestors, bystanders, and press as a means of "crowd control," absent *any* imminent threat of serious harm to anyone, is inherently excessive, and violates the Fourth Amendment.

192.    Remedies available at law are inadequate to fully compensate for Plaintiffs' injuries because the loss of their First and Fourth Amendment constitutional rights constitutes an irreparable harm. Furthermore, permanent injunctive relief is necessary to ensure that future harm is not inflicted on Plaintiffs and others seeking to exercise their constitutional rights in Dallas. Without permanent injunctive relief to prevent the City of Dallas Defendants' and those working with them from using these tactics on crowds or people not posing an immediate threat of serious harm at the time in the future, Plaintiffs and others similarly situated will be chilled from exercising their constitutional rights and could potentially incur additional physical injuries caused by the City of Dallas Defendants.

193.     Considering the balance of hardships between Plaintiffs and the City of Dallas Defendants, a remedy in equity is warranted. Plaintiffs' injuries and the likelihood of future injuries to Plaintiffs and other peaceful protesters similarly situated outweigh any damage that the injunction will cause Defendants. The DPD Officer Defendants' use of allegedly "less lethal" devices to control crowds during protests harms not just the Plaintiffs in this lawsuit but many similarly situated people seeking to exercise their First Amendment rights, including members of the press. Rather than develop a narrowly tailored policy to deal with the scarce few disruptive protesters, the City of Dallas Defendants have chosen an overbroad one: punish all protesters (as well as the press who cover their demonstrations and bystanders who may be nearby) with chemical weapons such as tear gas, smoke bombs, flash-bangs, pepper balls, mace, and KIPs such as rubber, sponge, and foam bullets—among other riot-control weapons and techniques— rather than specifically deal with any individual persons who pose an immediate threat of serious harm at the time. Whatever interest the City of Dallas Defendants might have in preventing property destruction or keeping roadways safe Roes not and cannot justify continuing to deploy lethal weapons against peaceful protesters. Finally, the City of Dallas and Chief Hall both agreed to the entry of an Agreed Preliminary Injunction in a related case, indicating that the balance of hardships here Roes, in fact, weigh in favor of Plaintiffs' request for permanent injunctive relief.

194.     Permanent injunctive relief would also best serve the public interest. It is always in the public interest to prevent the violation of a party's constitutional rights. Because the City of Dallas Defendants have pursued and continue to pursue a policy of excessive force against peaceful protesters in violation of their First and Fourth Amendment rights, Plaintiffs request that the Court issue an order permanently enjoining the indiscriminate use of this "less lethal" force on people who pose no immediate threat of serious harm at the time.

195.     Accordingly, Plaintiffs seek permanent injunctive relief to prohibit the City of Dallas

Defendants, and all DPD Officers from:

    a.    using "less lethal" weapons, such as tear gas, smoke bombs, flash bangs, pepper balls, mace, and other chemical agents in connection with protests: (a) against any protesters, bystanders, civilians, or members of the press, who are not posing any immediate threat of serious harm to anyone, or (b) using such devices or chemical agents for purposes of controlling peaceful crowds;

    b.    firing or deploying KIPs into a crowd for any purpose; and

    c.    using kettling or other similar methods to unconstitutionally seize or detain people peacefully exercising their constitutional rights.

**H.**    **CONSPIRACY**
**COUNT EIGHT – 42 U.S.C. § 1985**
**(Against City of Dallas Defendants, Dallas County Defendants, State of Texas Defendants and Federal Defendants)**

196.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

197.    As to each of the above causes of action, by the facts set out herein, Defendants, in whole or part, conspired with each other to (a) deprive, either directly or indirectly, Plaintiffs (and other protesters) of the equal protection of the laws, and of equal privileges and immunities under the laws; or (b) hinder others from giving or securing equal protection of law to all persons in violation of 42 USC § 1985(3).

198.    The City of Dallas Defendants, the Dallas County Defendants, the State of Texas Defendants, and Federal Defendants conspired (1) across separate law enforcement departments and (2) between local police (DPD Officer Defendants), county sheriff's deputies (Sheriff Deputy Defendants), state police (State Trooper Defendants) and federal agencies (Federal Agent

Defendants) to deprive Plaintiffs of the equal protection of the laws or to prevent or inhibit others from giving or securing equal protection to all persons.

199.    The DPD After Action Report and photographs taken by Plaintiffs show that Sheriff Deputy Defendants and State Trooper Defendants were present at the protests Plaintiffs attended and that they engaged in the same actions that violated Plaintiffs' constitutional rights as the DPD Officer Defendants.

200.    As a direct and proximate result of Defendants' acts in furtherance of their conspiracy while acting under color state law, Plaintiffs were deprived of their Fourth and Fourteenth Amendment rights and suffered injuries and damages.

## VIII.   <u>DAMAGES</u>

201.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

202.    In whole or in part, as a result of some or all of the above actions or omissions of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of these violations. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs have suffered and will continue to suffer severe pain of mind and body, emotional dress, physical manifestations of emotional distress, and humiliation. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs were prevented and will continue to be prevented from participating as activists and peaceful protesters with regard to causes that directly impact their lives and the lives of their friends, families, and communities.

203.    Defendants' acts and/or omissions were a proximate cause of the following injuries suffered by Plaintiffs:

    a.    Actual damages;

    b.    Pain and suffering and mental anguish suffered by Plaintiffs;

c.    Loss of quality of life;

d.    Where applicable, exemplary and punitive damages as well as reasonable attorneys' fees and costs of court;

e.    Pursuant to 42 U.S.C. § 1988, and other applicable laws, Plaintiffs should be awarded reasonable attorney's fees for the preparation and trial of this cause of action, and for its appeal, if required;

f.    Prejudgment interest; and

g.    Post judgment interest.

204.    Plaintiffs seeks unliquidated damages in an amount that is within the jurisdictional limits of the court.

## IX.    <u>PUNITIVE/EXEMPLARY DAMAGES</u>

205.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

206.    Additionally, and in the alternative, the conduct of Defendant Law Enforcement Officers were done with malice.

207.    In the alternative, the DPD Officer Defendants', the Sheriff Deputy Defendants', and the State Trooper Defendants' heedless and reckless disregard of Plaintiffs' rights, safety, and welfare constitutes more than momentary thoughtlessness, inadvertence, or misjudgment. Instead, the DPD Officer Defendants, the Sheriff Deputy Defendants, and the State Trooper Defendants acted with reckless or callous indifference to the federally protected rights, safety, or

welfare of others. Defendants had actual, subjective awareness of the risks of injury or illegality involved, but nevertheless proceeded with conscious, reckless, or callous indifference to the rights, safety, or welfare of others, including Plaintiffs.

208.    Such unconscionable conduct goes beyond ordinary negligence, and as such, Plaintiffs requests punitive and exemplary damages to deter this type of conduct in the future. In the

alternative, such heedless and reckless disregard of Plaintiffs' rights, safety and welfare is more than momentary thoughtlessness, inadvertence or misjudgment. Such unconscionable conduct goes beyond ordinary negligence, and as such Plaintiffs requests punitive and exemplary damages are awarded against Defendant Officers in a sum which is within the jurisdictional limits of this court.

## X.     COSTS AND ATTORNEY FEES

209.    Plaintiffs incorporate by reference paragraphs above as if fully set forth herein.

Plaintiffs are entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b) and other applicable provisions or in equity. As such, Plaintiffs requests the Court to award costs and attorney fees incurred in Plaintiffs' prosecution of this litigation.

## XI.     TRIAL BY JURY

210.    Plaintiffs have paid a jury fee and demands trial by jury.

## XII.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs has and recovers judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

/s/ Kim T. Cole
KIM T. COLE
Texas State Bar No. 24071024
**K. COLE LAW, PLLC**
11450 U.S. Highway 380
Cross Roads, Texas 76227
(214) 702-2551 (phone)

FIRST AMENDED COMPLAINT

(214) 602-5342 (fax)
kcole@kcolelaw.com
**COUNSEL FOR PLAINTIFFS**